**UNITED STATES of America, Plaintiff,**

and

**Gila River Indian Community, Plaintiff in Intervention,**

and

**San Carlos Apache Tribe, Plaintiff in Intervention,**

v.

**GILA VALLEY IRRIGATION DISTRICT, et al., Defendants.**

**Globe Equity No. 59.**

United States District Court, D. Arizona.

March 23, 1996.

See also 454 F.2d 219.

## PHASE IV MEMORANDUM AND ORDER—AMENDED

COUGHENOUR, District Judge.

This is the fourth phase of the most recent round of litigation concerning the enforcement of the Globe Equity Consent Decree of June 29, 1935 (hereafter "Decree")[1] for the benefit of the Gila River Indian Community (hereafter "GRIC") and the San Carlos Apache Tribe (hereafter "Apache Tribe" or "Apaches"). The Court held trial November 7–17, 1994 and heard closing arguments January 18, 1995. The Court heard evidence and argument related to the following issues:

(1) whether the Apache Tribe's rights to the natural flow of the Gila River are compromised by farming activities in the upper valleys;

(2) whether apportionments to the Upper Valley Defendants (hereafter "UVDs") are subject to prior calls of both the San Carlos Apaches and the GRIC;

(3) whether Article VIII(4) requires that there be sufficient water stored for the proper irrigation of 80,000 acres of San Carlos Project lands before any apportionment may be made to UVDs;

(4) whether the Decree prohibits the diversion of the entire flow of the Gila River by defendants in the Duncan–Virden Valley pursuant to the "Cosper's Crossing condition";

(5) whether, under Article VIII(5), UVDs are prohibited from diverting an available apportionment unless there is water presently stored and available for release in the San Carlos Reservoir;

(6) what method the Water Commissioner should employ in deducting transit and seepage losses;

(7) whether the Decree endows the lands in the Gila Crossing District with priority rights that may be enforced as against all upstream parties to the Decree;

(8) what reporting scheme the Water Commissioner should adopt for ensuring that water is not diverted for use on lands not "then being irrigated," and whether the "then being irrigated" clause and the reporting scheme apply equally in the lower valleys;

(9) whether the Decree prohibits the use of the waters of the Gila River for purposes other than irrigating "crops of value";

(10) whether the call system being implemented for managing the Gila River complies with the legal requirements of the Decree; and

(11) whether the Court should order the permanent removal from the Decree those lands that have been determined to be urbanized by the Arizona Department of Water Resources.

It is unnecessary to restate the facts here, as they have been carefully laid out in prior decisions of this Court and the court of appeals. *See, e.g., United States v. Gila Valley Irrigation Dist.,* 31 F.3d 1428 (9th Cir.1994); *United States v. Gila Valley Irrigation Dist.,* 961 F.2d 1432 (9th Cir.1992); *United States v. Gila Valley Irrigation Dist.,* 454 F.2d 219

---

1. Specific Articles of the Decree are referred to throughout this memorandum by Article number, such as "Article VIII(4)."

**1448**

(9th Cir.1972); *United States v. Gila Valley Irrigation Dist.*, 804 F.Supp. 1 (D.Ariz.1992). The Court's findings of fact relative to the specific issues decided here are set forth as necessary below.

## I. WATER QUALITY

The Apache Tribe argues that the waters of the Gila River are contaminated by farming practices in the upper valleys and that the Tribe is therefore deprived of its right under the Decree to the "natural flow" of the stream. UVDs argue that the water quality deteriorates as the river passes through the upper valleys due to natural causes, some of them unknown. For the reasons expressed below, the Court finds (1) that the water reaching the San Carlos Reservation is of significantly lower quality than the water in the upper valleys, (2) that UVDs are responsible to a significant degree for the degradation of the water reaching the reservation boundary, and (3) that equity requires that certain measures be adopted to protect the Tribe's water right.

■ The courts of the western states generally agree that a prior appropriator of water is entitled to protection, including injunctive relief, against material degradation of the quality of the water by junior appropriators upstream. *See, e.g., Phoenix Water Co. v. Fletcher*, 23 Cal. 481, 487 (1863); *Salt Lake City v. Boundary Springs Water Users Ass'n*, 2 Utah 2d 141, 270 P.2d 453 (1954). Further, the Supreme Court has held:

> What diminution of quantity, or deterioration of quality, will constitute an invasion of the rights of the first appropriator will depend on the special circumstances of each case, considered with reference to the

uses to which the water is applied. A slight deterioration in quality might render the water unfit for drink or domestic purposes, whilst it would not sensibly impair its value for mining or irrigation. In all controversies, therefore, between him and parties subsequently claiming the water, the question for determination is necessarily whether his use and enjoyment of the water to the extent of his original appropriation have been impaired by the acts of the defendant.

*Atchison v. Peterson*, 87 U.S. 507, 514–15, 22 L.Ed. 414 (1874). *See also Arizona Copper Co. v. Gillespie*, 230 U.S. 46, 56–58, 33 S.Ct. 1004, 1006–07, 57 L.Ed. 1384 (1913).[2] There is no substantial dispute that the United States and the Apache Tribe bear the burden of proof on this issue. *E.g., Pacific Portland Cement Co. v. Food Mach. & Chem. Co.*, 178 F.2d 541, 546 (9th Cir.1949).[3]

### A. Overview

The Gila River once supported irrigation from its surface flow in regions extending from above the New Mexico border to the confluence of the Gila and the Salt River. The river is now overdeveloped and overallocated. In the upper valleys, surface flow is heavily augmented with water pumped from wells. Further, the growers in the upper valleys on occasion divert the entire flow of the stream into irrigation canals to serve the acreage they farm. The return flows from diversions are often recycled, diverted again and applied to other fields. The effects of these and other practices contribute to a dramatic increase in both the salt load and the salinity of the Gila River. The salt load is increased, in part, by pumping groundwater that is higher in salt content than the

---

**2.** *Gillespie* upheld the issuance and modification of injunctive relief to prevent the pollution of the Gila River with "slimes, slickens, and tailings" from copper mines and reduction and concentration works. The pollutants entered the stream near Clifton, Arizona, causing irreparable harm to irrigators on the Montezuma Canal. The Court applied the maxim *"sic utere tuo ut alienum non lædas"* (use your own property in such a manner as not to injure that of another). *Gillespie*, 230 U.S. at 57, 33 S.Ct. at 1007.

**3.** The plaintiffs argue that this Court earlier placed the burden on UVDs to demonstrate that

they were not degrading the water. *See Gila Valley Irrigation District*, 804 F.Supp. at 6. There, the Court stated it would revisit the issue of whether the Tribe was entitled to a live stream condition "[i]f during the next phase of the litigation, the Court is persuaded that UVDs may divert the entire flow of the stream without compromising the Tribe's right to natural flow, or without degrading the water to any greater extent than if some portion of it went undiverted." This language does not, indeed could not, place the burden of proof on UVDs.

surface flow and mixing it with the stream. Salinity increases as the river flows through the Safford Valley due to the diversion of the entire stream and the consumptive use of the water, but not the salt, by irrigated crops and other plants. By the time the flow, if any remains, reaches the San Carlos Reservation boundary, the water is degraded to such a degree that the Apache Tribe may be unable to grow the types of vegetable and grain crops that were once raised there.

## B. Water Quality of the Gila River

There are two interrelated aspects to the water quality issue in this case: flow rate and contamination. The contaminant is salt, which prevents the successful cultivation of a variety of crops.[4] The issue of flow rate is, in this case, inseparable from the issue of salt, given the general agreement among the testifying experts that flow rate is a primary factor affecting water quality: at a high level of generalization, the lower the flow rate, the poorer the quality of the water.[5]

To see the difference in the quality of the water available to the UVDs and that available to the Apache Tribe, one need only compare salinity in the upper valleys and salinity at the reservation boundary. Plaintiffs' expert witnesses conducted extensive field studies in 1993 and 1994, sampling water and measuring flow rates at various sites in the upper valleys and on the reservation. Their data for June 27 and 28, 1994, for example, revealed total dissolved solids (TDS) of 600 milligrams per liter (mg/l) at the head of Safford Valley (below the Brown Canal diversion point).[6] In the middle portion of the valley, above Smithville Canal, the TDS increased to 1,250 mg/l. At the lower end of the valley, above the Fort Thomas Canal diversion, TDS was 1,382 mg/l. And at the reservation boundary, TDS was measured at 1,992 mg/l. *See* Stetson Engineers, Inc., *Preliminary Review of the Suitability of the Quality of Gila River Water to Irrigate Lands of the San Carlos Apache Reservation, Arizona* I–34 (September 15, 1994) (hereafter "Stetson Water Quality Report"). Further evidence related to these field studies was submitted at trial. Samples taken between August 17 and 19, 1994 revealed a similar trend, although the salinity was even greater in the lower reaches of the upper valleys. Specifically, the engineers measured TDS of 657 mg/l at Brown Canal, 1,638 mg/l at Smithville Canal, 1,690 mg/l at Fort Thomas, and 1,830 mg/l at the reservation boundary.[7]

The evidence at trial also demonstrated unequivocally that flow rate is inversely related to salinity. Plaintiffs' experts employed data collected by John D. Hem[8] in

---

4. There is no serious dispute regarding the presence of other contaminants in the stream: the Tribe and the government failed to present substantial evidence of significant, let alone unreasonable, contamination by fertilizers, pesticides, or any other chemical agents commonly associated with irrigated agriculture in the upper valleys. The water quality issue, as tried to this Court, concerned salts.

5. In this discussion of water quality, certain units of measure appear frequently. Electrical conductivity (EC, sometimes referred to as "specific conductance") is expressed in units of deciSiemens per meter (dS/m) or microSiemens per centimeter (cS/cm). Total dissolved solids (TDS) is expressed in units of parts per million (ppm) or milligrams per liter (mg/l).

The relationship between TDS and EC may be approximated as: TDS (ppm) = 640 × EC (dS/m), for EC values of less than 5 dS/m. *See generally* Stetson Engineers, Inc., *Preliminary Review of the Suitability of the Quality of Gila River Water to Irrigate Lands of the San Carlos Apache Reservation, Arizona* I–14, I–29, II–9–10 (September 15, 1994).

Flow rate is expressed in units of cubic feet per second (cfs). Water volume is generally expressed in acre feet (AF), and irrigation allotments are generally expressed in acre feet per acre (AFA).

6. The testifying experts agree that both TDS and EC are representative of salinity. TDS simply indicates the amount of solids dissolved in the water. EC is relevant to a plant's capability to extract moisture from the surrounding soil matrix and is used to characterize a plant's response to salinity in the root zone. The higher the value for EC or TDS, the greater the salinity of the water.

7. This memorandum does not attempt to summarize all of the data. The field studies are fully documented in the *Stetson Water Quality Report,* where the data is represented in tables and figures that reveal the trends clearly.

8. *See* Geological Survey Water–Supply Paper 1104: John D. Hem, *Quality of Water of the Gila River Basin Above Coolidge Dam Arizona* (1950) (hereafter "Hem Report").

the 1940s to prepare graphic depictions of the relationship between flow rate and electrical conductivity (EC) as the river flows downstream from Blue Creek, New Mexico, to Calva, Arizona. The evidence shows that as the flow rate decreases in the Safford Valley, EC rises. In fact, the difference can be quite dramatic, with EC levels often as low as 1,000 microSiemens per centimeter (cS/cm) in the central reach of Safford Valley and as high as 5,000 cS/cm on the reservation. *See Stetson Water Quality Report* at I–22, II–12 to II–14, Table II–4 & Figure II–3. In graphical representations, the rapid divergence of lines representing EC and flow rate is apparent. EC begins to rise at the head of Safford Valley, while flow rate declines. Salinity peaks in the neighborhood of Fort Thomas, about 25 miles downstream from Safford. Beyond Fort Thomas, at the bottom of the Safford Valley, the water quality stabilizes or improves. *See generally Stetson Water Quality Report* I–20 to I–25 (analyzing Hem's data). Precisely the same trend is reflected in United States Geological Survey (USGS) data and the Stetson field data collected in 1993 and 1994. *See id.* at I–36, Figure I–10b. On the other hand, if the flow is maintained at or above 100 cfs, EC remains stable at values well under 2,000 cS/cm. *Id.* at I–23–24, Table I–6 & Figure I–6.

### C. Causes of Degradation of Water Quality

■ Plaintiffs, the government and the Apache Tribe, argue that the degradation of the Gila River water quality is the direct result of various farming practices in the upper valleys. UVDs dispute this. They argue that the degradation, if there is any, is the result of purely natural causes and that the water would be similarly degraded if cultivation in the upper valleys ceased and the lands were taken over by wild vegetation.

The Court finds abundant evidence supporting plaintiffs' view. There are two primary causes of the increased salinity and salt load in the river: pumping from the groundwater and diverting the entire natural flow of the stream.

*Pumping from groundwater:* The effect of pumping on the salt load and salinity is difficult to overstate. The amount of water pumped prior to the entry of the Decree was apparently quite small. By 1938, there were about 30 wells in the upper valleys. *See* Gookin Engineers, *A Technical Report on Various Aspects of Globe Equity No. 59,* ch. 1, at 15 (August 1994) (hereafter "Gookin Technical Report"). In each of the years 1937, '38, and '39, about 20,000 acre feet (AF) were pumped from the groundwater. Trial Transcript (hereafter "Tr.") at 230–32 (November 8, 1994) *See also Stetson Water Quality Report* II–4 to II–6, Table II–1 (showing pumping in years after 1940). The number of wells and the amount of water pumped steadily increased. Gookin Engineers estimates that there were 900 wells in the Safford Valley by 1958. *Gookin Technical Report,* ch. 1, at 16. In recent years, the amount of groundwater pumped in the Safford Valley has varied between 214,100 AF (1977) and 62,400 AF (1986). *Stetson Water Quality Report* II–5. In general, UVDs pump greater amounts of water in dry years, when the surface flow is low, and lesser amounts in wet years, when there is more surface flow to meet their irrigation needs.

The expert witnesses disagreed about the extent to which groundwater pumping affects the water quality. The greater weight of the evidence and the more plausible analysis support plaintiffs' argument that the effects are significant. First, some of the wells in the Safford Valley tap into very high salinity water sources. The evidence was uncontroverted that there are natural high-salinity artesian seeps flowing into the Gila, but the flow from these seeps is very low, so their effect on overall salinity is minimal. Certain "hot" wells, however, are responsible for localized TDS elevations of several hundred percent.[9]

Second, all of the evidence indicates that the groundwater is higher in salts than undiverted surface flows. Pumping from groundwater adds salt to the surface flow of the Gila River. The increased salt load in

---

9. These wells are likely tapping into the basin-fill aquifer, which all of the experts agree harbors

much more saline water than the alluvium above it.

pumped water contributes directly to the increase in salinity as the river flows through the Safford Valley. Moreover, pumping during the dry summer months places the lower quality water in the stream at the time when natural flows are at their lowest and demand on the stream is at its highest.

Third, groundwater pumping contributes to a decline in the water table, leading to a "losing stream" phenomenon, in which the river loses water to the groundwater. Surface flow may be seriously depleted or eliminated due to nearby pumping. Also, a losing stream condition can exacerbate the salinity problem to the extent that surface flows of higher quality, such as from precipitation and sudden freshets, go to recharging the alluvial aquifer, rather than remaining on the surface.

Fourth, excessive pumping alters the relationship between the alluvial aquifer, immediately underlying the riverbed, and the basin-fill aquifer, which is an older geologic formation up to a hundred feet below the surface. Water in the basin-fill aquifer is at a higher pressure than that in the alluvial aquifer. When large amounts of water are pumped from the alluvium, the piezometric relationship between these two aquifers is altered and the water from the basin-fill aquifer seeps upward into the alluvial aquifer. Because the basin-fill aquifer is much higher in salts than the alluvial aquifer, this seepage increases salts in the alluvium and in the river.

*Diversion of the entire flow of the stream:* The evidence demonstrates that UVDs on occasion divert the entire flow of the stream at various canal headings. The water arriving back at the river consists largely of irrigation return flows that have absorbed salts from the soils to which the water was ap-

plied. This cycle is repeated when the entire flow is diverted at canal headings downstream. Thus, the river becomes an "agricultural drain" carrying salts from the soils of the cultivated acreage. Also, diversion of the entire flow of the river exacerbates the deleterious conditions created by pumping, including the losing stream phenomenon and the upward seepage from the basin-fill aquifer into the alluvial aquifer.[10]

These practices contribute to salt load and salinity in a fairly straightforward manner: As water is diverted and used for irrigation, the ratio of salt to water increases, because the plants consume only the water, leaving the salt behind. Additions of salt to the system, from both natural and artificial sources, add to the burden of salt in the stream.

UVDs acknowledge that the quality of the Gila River deteriorates as it proceeds through the Safford Valley toward the San Carlos Reservation and that this deterioration is attributable to increased concentrations of salts. Further, UVDs concede that the greatest contributor of salt in the Safford Valley is the basin-fill aquifer. UVDs argue, however, that the influx of salt in the Safford Valley is from a natural cause. They further argue that the water is not significantly worse than it was in the early 1940s and that the Apaches would receive equally salty water if irrigated agriculture in the Safford Valley ceased.

The Court cannot agree that the influx of salt in the Safford Valley is primarily natural. The parties agree that the salt load increases significantly in the vicinity of Fort Thomas. UVDs' expert witness, Dr. Gerald Matlock, states that this inflow of salt is attributable to (1) the natural upward migra-

**10.** Plaintiffs also argue that diversion of the entire stream in the Duncan–Virden Valley, pursuant to the "Cosper's Crossing condition" contributes to the deterioration of the water quality. (Cosper's Crossing is discussed in detail Section IV, below.) Plaintiffs, however, presented scant evidence of water-quality degradation in the Duncan–Virden Valley, and rely primarily on the untested assumption that the factors present in the Safford Valley play a similar role in the Duncan–Virden Valley. While the evidence does demonstrate that the San Francisco River, which joins the Gila below the Duncan–Virden Valley, is significantly saltier than the Gila above the confluence, the evidence does not support the conclusion that diversions pursuant to the Cosper's Crossing condition were a major contributor to salinity below. Nonetheless, as discussed in Section IV, diversions of the entire flow under the Cosper's Crossing agreement may violate the Decree to the extent that they affect the water commissioner's ability to satisfy a prior call issued by the Apache Tribe.

tion of saline water from the basin-fill aquifer, and (2) a geologic phenomenon he refers to as the "Fort Thomas anomaly." The Court agrees with plaintiffs, however, that Dr. Matlock overstates the effect of natural migration from the basin fill to the alluvium.[11] Nor is the Fort Thomas anomaly a plausible explanation for the salt. Dr. Matlock hypothesizes that there are unknown geological forces at work creating an enormous salt influx from the basin-fill aquifer in the area of Fort Thomas. Dr. Matlock's argument is speculative and lacks support in the form of physical evidence. It is, moreover, directly at odds with the more carefully documented conclusion of other expert witnesses that, absent pumping from the groundwater, the natural migration of water from the basin-fill aquifer has a relatively small effect. Pumping, however, causes immediate and significant increases in upward flow from the basin fill, in addition to directly affecting salinity by bringing the saline groundwater to the surface.

UVDs also argue that the quality of the water leaving the Safford Valley has not changed in over fifty years. UVDs rely almost exclusively on a trial exhibit comparing EC and flow rate in the Safford Valley in July of 1941 and August of 1994. The exhibit indicates that EC in 1994 was about the same, if not somewhat improved, relative to EC in 1941. The Court agrees with plaintiffs that the exhibit does not compare two similar moments in the river's history and provides little valuable information concerning the long-term degradation of the river. First, the conditions that existed in 1941 are differ-

ent from those of 1994. Three very dry years preceded 1941.[12] The evidence at trial indicated that flows will be more saline during extended periods of dry weather or drought because (1) when flow is diminished the concentration of salts is higher and (2) when flows are low for an extended period, there is a corresponding lack of "flushing" of the salts from the riverbed and soils. The high flows in 1941 would, according to the testimony, be expected to flush out the salt buildup. In marked contrast, 1994 followed on the heels of three of the wettest years this century.[13] These extremely high flows would likely have left the riverbed relatively free of salt and the alluvial aquifer recharged with low-salinity water. Second, UVDs erroneously assert that the exhibit demonstrates that pumping is not the cause of the increased salinity. In fact, UVDs were pumping 20,000 to 25,000 AF of water for five years prior to 1941. See Tr. at 230–31 (November 8, 1994). Although pumping has significantly increased since that time, it cannot be plausibly asserted that pumping would have had no impact on the river system prior to 1941. Finally, in 1994, the Water Commissioner, acting pursuant to this Court's order, maintained a live stream condition in the Safford Valley. This could have had a measurable impact on salinity. For these reasons, 1941 and 1994 make a poor comparison of the long-term condition of the river.

UVDs also argue that the Apache Tribe would receive equally degraded water if no irrigation at all occurred in the upper valleys, because UVDs' lands would be taken over by phreatophytes.[14] UVDs argue that their

---

11. Dr. Matlock incorrectly reports the estimated flow rate from the basin-fill into the alluvium as 0.4 to 2.4 acre feet per day per mile. See W. Gerald Matlock, *Improvement of Irrigation Water Supply, Irrigation System Operations, and Gila River Water Quality for the San Carlos Reservation: A Proposal from the Upper Valley Defendants* 4 (November 16, 1994) (hereafter "Matlock Improvement Report"). The actual values estimated by Ronald L. Hanson are 0.14 to 2.4 acre feet per day per mile. See Geological Survey Professional Paper 655–F: Ronald L. Hanson, *Subsurface Hydraulics in the Area of the Gila River Phreatophyte Project, Graham County, Arizona* 27 (1972). More importantly, Dr. Matlock's analysis makes no adjustment for the fact that seepage from the basin-fill is to the bottom of the alluvium, not to the surface. Migration of saltier

basin-fill water into the alluvium, one hundred feet or more below the riverbed, cannot, by itself, account for the salinity of the surface flow.

12. The flows at Calva in the three years preceding 1941 were 106,200 AF, 91,520 AF and 158,300 AF. In 1941, the flow at Calva was 804,100 AF.

13. Flows at Calva for 1991, 1992, and 1993 were 618,900 AF, 1,100,000 Af, and 1,775,000 AF, respectively.

14. A phreatophyte is a plant that depends on ground water within the reach of its roots for water. Although the consumptive use varies greatly among species of phreatophytes, in gen-

crops consume only about 2.5 acre feet per acre (AFA) per year and that if phreatophytes invaded their lands, the consumptive use would rocket to 5 AFA per year, leaving the river as salty, if not saltier, than it is now. UVDs assume, first, that half of their lands will give over to phreatophitic growth if crop irrigation ceased. There is no evidence to support this assumption. The argument also assumes, without supporting evidence, that wild phreatophytes will draw on the river in the same manner as a crop being irrigated during a growing season with diverted and pumped water. The evidence at trial indicates that this is an unreasonable assumption, both because wild phreatophytes do not receive water in the same way as irrigated crops and because UVDs would not, in any case, pump groundwater and divert the river to serve wild phreatophytes on their lands, some of which are several miles downstream of the canal headings.

Based on the evidence discussed here and the totality of the evidence presented at trial, the Court finds that the farming practices of UVDs, particularly pumping and diverting the entire stream flow, are significant causes of the degradation of the quality of the Gila River.

### D. Extent of Water Quality Degradation

Plaintiffs' experts, compiling data from several sources, estimate that man-made contributions to salt load account for almost half of the increase in salt in the Safford Valley. *See* Stetson Engineers, Inc., *Preliminary Review of the Salt Balance of Safford Valley* 3 (November 3, 1994). The Stetson salt balance study estimates the contribution of salts from various artificial and natural causes, expressed as percentages of the total salt inflow. Stetson Engineers concluded that the artificial contributions include: (1) returns to the river of diverted flows, representing 17% of the salt inflow; (2) returns to the river of pumped underground water, representing 25% of the salt inflow; and (3) artesian wells, representing 6% of the salt inflow. Roughly 36% of the salt inflow in the

Safford Valley is attributed to the salt in the flow when it enters the Valley. Plaintiffs assert that some portion of this salt load is also man-made, stemming from diversions and pumping in the Duncan–Virden Valley.

Defendants' expert witness, Dr. Matlock, also prepared a salt balance study. Having rejected several of UVDs' working assumptions and arguments, the Court finds it unnecessary to evaluate the parties' various arguments related to that study.

However, the Court agrees with defendants that the Stetson salt balance may overstate the effect of UVDs' farming practices in at least two ways. First, the salt balance study relies on data from 1941 regarding the determination that 25% of all irrigation water, both pumped and diverted, returns to the river as surface runoff. The Court agrees with UVDs that this conclusion may inappropriately discount the effect of more modern farming practices, such as laser leveling of cultivated fields, that reduce surface runoff. Second, the Stetson salt balance reflects the underlying assumption that phreatophytes do not increase salinity at all. However, the evidence unequivocally supports the conclusion that phreatophytes do have an effect on salinity, because they consume large quantities of water and leave behind salt. This has an impact on salt concentration in the remaining water, as well as on localized salt concentrations in the soils. In light of the conflicting testimony, the Court is unpersuaded that the effect is either as great as UVDs suggest or as small as plaintiffs suggest.

The Court cannot conclude that artificial contributions of salt account for a full half of the salt load leaving the Safford Valley. It is sufficient to conclude, for purposes of the issue before the Court, that UVDs' contributions to the salt load are significant enough to warrant injunctive relief, as described further below.

---

eral, they consume more water than other plants in the same environment. Salt cedar (*tamarix pentandra* Pall.) is one of the most vigorous phreatophytes, exhibiting a consumptive use of up to 9 AFA. *See generally,* Geological Survey Paper 655–A: R.C. Culler, *et al., Objectives, Methods, and Environment—Gila River Phreatophyte Project, Graham County, Arizona* 1–2 (1970).

## E. Effects of Water Quality Degradation

The Apaches argue that the degradation of the water reaching the San Carlos Reservation impedes their efforts to cultivate the types of salt-sensitive crops they once grew. UVDs argue that the effects are overstated and that recent experience justifies the conclusion that the Tribe can raise a variety of crops commercially.

The irrigated agriculture of the Apache Tribe prior to the entry of the Decree included a variety of crops, several of which are salt-sensitive and moderately salt-sensitive. Prior to the turn of the century, the Tribe cultivated and harvested wheat, barley, corn, and beans. Testimony at trial established that ancestors of Apaches on the reservation today grew sugar cane, corn, melon, cantaloupes, peppers, Apache squash, and a native sweet corn, in addition to oats, wheat, hay, and alfalfa and various garden vegetables. The Tribe states that it can no longer grow such moderately salt-sensitive crops as alfalfa, but must cultivate, if anything, salt-tolerant crops such as barley, wheat, and cotton.

UVDs argue that there is a lack of evidence that the Tribe grew salt-sensitive crops commercially. First, UVDs point out that there is little evidence that Apaches grew pinto beans, a particularly salt-sensitive crop. The Court agrees that, although the record demonstrates that Apaches grew beans, it is difficult to conclude that there were large harvests specifically of pinto beans. Upper Valleys farmers testify that pinto beans cannot be grown with Gila River water at all, due to a variety of rust whose spores are present in the stream flow. The Court agrees generally with the Tribe, however, that the historical record amply demonstrates harvests of a variety of moderately salt-sensitive crops, including, but not limited to, corn, pumpkins, melons, and cabbage. Equally important, the historical record documents the Tribe's attempts, often defeated by matters beyond its control (and unrelated to water quality), to cultivate and harvest such crops.

The Tribe and the government presented persuasive evidence that the salinity of the Gila River reaching the San Carlos Reservation today prevents the successful cultivation of such crops as alfalfa, pinto beans, squash, corn, melons, and garden vegetables. As the expert testimony at trial indicates, there are two important factors determining crop viability and yield: the quantity of the water and the quality of the water. Because the Tribe, like other parties to the Decree, is limited to an annual water duty of 6 AFA, it is critical that the water applied to the lands be of sufficient quality to permit the successful growth of the crops. Plaintiffs experts, using well-accepted statistical modeling, demonstrated that commercial yields of salt-sensitive and moderately salt-sensitive crops are unlikely unless the quality of the water reaching the reservation improves.[15] Witnesses from both sides agreed, however, that the Tribe can produce full yields of salt-tolerant crops, such as barley, oats, hay, and wheat.

The Court concludes, based on the evidence presented, that plaintiffs have documented the unlikelihood of successful commercial cultivation of salt-sensitive and moderately salt-sensitive crops using Gila River water at its current levels of quality. The Court notes, however, that individual farmers from the upper valleys, such as J.D. Colvin, were optimistic that certain types of crops grown in the upper valleys could, in fact, be cultivated on the reservation. If Mr. Colvin continues his work with the Apache Tribe, it is possible that the dire conclusions of the expert witnesses will be proven incorrect. Until such a demonstration is made, however, the Court must conclude that the effect of the water quality degradation on the Apache Tribe's efforts to revitalize their agriculture are of a magnitude warranting some form of injunctive relief.

## F. Restoring Water Quality at the Reservation

As the above discussion indicates, the Court concludes that injunctive relief is re-

15. The Court is persuaded, moreover, that the data presented by UVDs on this issue was equivocal at best, positing full crop yields for alfalfa when the plant is deprived of water during significant portions of the irrigation season.

quired to restore to the Apache Tribe water of sufficient quality to sustain commercial production of the sorts of crops they grew prior to the entry of the Decree.

UVDs propose extending the Fort Thomas canal (joined with two other canals) to the reservation boundary. An extension of the canal, they argue, would supply the Tribe with water of the same quality as irrigators in the Fort Thomas region receive. The Tribe objects to this proposal for several reasons. First, extending the Fort Thomas canal will not deliver the water to the Tribe's irrigated lands, but will only get the canal water to the eastern boundary of the reservation. The Tribe is not in a financial position to complete the canal project. Also, UVDs apparently expect the Tribe to join the canal association and pay dues like other users. Second, water from the Fort Thomas canal may not be of the same quality as the Gila River would be, if some amount of the natural flow passed through the upper valleys without being diverted. The Tribe notes that the canal water, by the time it reaches the reservation, may have been applied more than once to cultivated lands and may be heavily supplemented with water pumped from the more saline groundwater. In other words, the canal water may not represent an improvement over the river water. Third, the Tribe will bear significant transportation and seepage losses from the reservation boundary to the fields. This may defeat the proposal entirely. Fourth, the Fort Thomas Canal has junior rights to some other canals and gets shut down earlier when users are limited to diverting on priority. The Tribe fears that it will forfeit its priority date by being placed on the canal. Fifth, the Tribe asserts its right under the Decree to the natural flow of the river. Even if the doctrine of prior appropriation permits a court to authorize a different point of diversion, an issue which the Court need not and does not

reach, the circumstances presented here do not warrant the imposition of a costly and untested approach that may conflict with the Decree. Therefore, the Court will not, under the circumstances presented here, force the Tribe to accept an equivalent amount of water from a source designated by a junior appropriator.[16]

The government and the Tribe offer a water quality management proposal drafted by Dr. Gerald T. Orlob. Dr. Orlob's plan focuses on maintaining EC at 2000 cS/cm at the reservation boundary, a value near or slightly higher than the average salinity found in the Safford Valley. This would theoretically allow the tribe to grow some moderately salt-tolerant crops.[17] Dr. Orlob also proposes attempting to maintain a flow rate of 30 cfs at the reservation boundary by limiting diversions. One objective of his proposal is that the Gila River be maintained as a live stream as far as possible within the natural variability of its flows, and that the stream not be allowed to go dry "as a consequence of diversions." Finally, Dr. Orlob proposes sealing artesian "hot wells," discontinuing the use of certain wells of abnormally high salinity, minimizing drainage from irrigated fields to the stream, lining canals that have excessive losses to ground water, and beginning development of both monitoring and modeling of the river and ground water system.

UVDs object to Dr. Orlob's proposals as unrealistic and possibly devastating to farmers. UVDs argue, for example, that sealing particularly salty wells will ruin certain farmers who rely heavily on well water. The Court agrees with plaintiffs, however, that the river cannot tolerate inflows of extremely salty water. Indeed, the proposal to seal unusually saline wells is somewhat modest.

The Court considers it unnecessary to adopt Dr. Orlob's proposal in its entirety at this time. Certain aspects of the proposal

---

16. At oral argument on ASARCO's motion to clarify on this issue, the UVDs suggested that the doctrine of prior appropriation would allow them to, for example, construct a stainless steel pipe from the head of the Fort Thomas Canal to the Apaches' fields and so supply the Tribe with its full diversion right. The Court is plainly not faced with the question of whether the Tribe could assert a right to natural flow over this form of delivery.

17. The Tribe requests that the Court provide for even broader injunctive relief by taking steps to guarantee that the water entering the reservation is of the same purity as is found at the head of Safford Valley, a value closer to 1000 cS/cm.

would work sweeping changes in the management of the river, some of which may prove unnecessary or unwise. Rather, the Court directs representatives of the affected parties to convene, with the assistance of the Water Commissioner, to discuss alternative methods of altering the management of the river to improve the continuity and quality of flow of the Gila River reaching the San Carlos Reservation.[18] The parties may conclude that they cannot agree on a proposed form of injunction, in which case they may submit proposed forms of injunction for the Court's review and possible adoption. Any proposed form of injunction must, however, provide for the following:

(1) a goal of reducing EC levels at the reservation boundary to within the range of 2,000 cS/cm during the peak irrigation months;

(2) sealing of artesian "hot wells," such as the artesian well near the Smithville diversion;

(3) limiting diversions in the Safford Valley as necessary to achieve a target flow rate at the reservation boundary. Such a target must be tied in some meaningful way to improving water quality for irrigation purposes. The Court notes that a proposed injunction could, but need not, provide for a gradually increasing target flow rate, with accompanying monitoring of water quality to determine an optimal flow rate for achieving an acceptable level of water quality; and

(4) relatively long-term monitoring and adjustment to ensure not only that the Tribe receives water sufficient for cultivating moderately salt-sensitive crops, but also that the measures taken are no more disruptive in the upper valleys than is reasonably necessary to achieve this goal.

The Court realizes that the Tribe seeks immediate relief on the issue of water quality. The Court concludes, however, that the evidence does not justify issuing an injunction that, for example, requires UVDs to

deliver water with EC values of 1,000 cS/cm or less. The Court firmly believes that the parties are in a better position to consider alternative measures for the realistic improvement of water quality in light of the Court's findings and conclusions set forth above. Further, the Court is optimistic that a measured approach to improving water quality will reveal that the Tribe's water rights can be satisfied without drastically altering the farming practices in the upper valleys.

Until such time as the parties have met, conferred, and advised the Court on a proposed course of action, the Court reissues the preliminary injunction entered in September of 1992, *Gila Valley Irrigation Dist.*, 804 F.Supp. at 7, and directs the Water Commissioner to implement the injunction as he had done prior to the vacation of that order by the court of appeals.

## II. PRIORITIES AND APPORTIONMENTS

■ UVDs argue that this Court's prior determination concerning the Apache Tribe's 1846 priority right may effectively render their apportionment rights illusory. GRIC argues that the UVDs have no one to blame for this but themselves.

This Court held in 1992 that

the Apache Tribe's prior right to 6,000 acre-feet of water from the flow of the Gila River is superior in all respects to the rights of the UVDs to the flow of the river. If, at any time, the Apache Tribe asserts its prior right to the natural flow of the Gila River, UVDs may not divert water either on priority or apportionment.

*Gila Valley Irrigation Dist.*, 804 F.Supp. at 7. On appeal, UVDs argued that this holding created the potential for what they call "circular priorities." *See Gila Valley Irrigation Dist.*, 31 F.3d at 1438. The court of appeals held that the issue was not ripe for adjudication because no call system was yet in place. *Id.* The appellate court also expressed its optimism that the Rules Com-

---

**18.** The parties may assemble a group consisting of lawyers, non-lawyers, technical experts, or otherwise.

mittee would "formulate a system that eliminates the UVDs' concerns regarding circularity, and preserves their apportionment right, without jeopardizing the Apache Tribe's priority right." *Id.* The Rules Committee did not, however, meet this challenge.

The "circular priorities" effect arises as a result of the juxtaposition of the parties and the relative priority of their calls on the river. Because UVDs' apportionment call is junior to the Apaches' priority call,[19] UVDs must allow sufficient water to pass to satisfy the Apaches' call of up to 12.5 cfs before UVDs may divert apportioned water. Because GRIC's immemorial priority call[20] is superior to the Apaches' 1846 priority call, however, GRIC asserts that the Apaches must similarly allow this 12.5 cfs to continue downstream if GRIC issues an immemorial priority call. As envisioned by UVDs, if the Apaches issue a call for 12.5 cfs while GRIC issues a call for 437.5 cfs, then the Apaches will not be permitted to divert any water until the flow exceeds 437.5 cfs, and UVDs will not be permitted to divert any water, even when they have an apportionment available, until the flow exceeds 450 cfs. But if the flow exceeds 480 cfs, UVDs may divert on the ordinary priority schedule, rather than relying on apportionments. Thus, they argue, the "circular priorities" effect renders their apportionments illusory.

This issue is now ripe for adjudication. Under the call system drafted by Gookin Engineers and proposed by GRIC, if UVDs make an apportionment call when both the Apaches and GRIC make priority calls on the river, then GRIC's call must be satisfied before the Apaches' call is satisfied, and the Apaches' call, in turn, must be satisfied before UVDs' call. This leaves the UVDs unable to divert on apportionment unless the

flow exceeds 450 cfs. UVDs' fears of the "circular priority" effect are therefore no longer speculative. Moreover, GRIC's proposal conflicts with that of the Water Commissioner. The Water Commissioner suggests a different procedure: UVDs would be permitted to divert on an available apportionment up to 437.5 cfs, but would be required to let pass any amount over 437.5 cfs to satisfy a call made by the Apaches. The Court understands that under the Commissioner's proposal the Apaches would be able to divert on their 1846 call before GRIC could divert on their immemorial priority call when UVDs divert on apportionment. But as between the Apaches' 1846 call and the UVDs' apportionments, the Commissioner assigns the higher priority to the apportionment. Given the need to implement a call system as soon as practicable, the Court concludes that the "circular priorities" issue must be resolved.

GRIC argues that the "circular priorities" effect is a predictable and unobjectionable consequence of both the language of the Decree and the process by which it was drafted. First, GRIC argues that because apportionments are exceptions to the priority schedule, they must be strictly applied in a manner that will not otherwise disrupt the priorities among other parties. More importantly, perhaps, GRIC argues that UVDs were the agents of their own discontent. GRIC relies on letters and memos written by the parties negotiating the Decree in the early 1930s. The negotiating parties devised a "substituted storage" plan under which UVDs would be permitted to divert water in disregard of the United States' prior rights, including those held on behalf of the San Carlos Apache Tribe, provided UVDs paid a fee of $10.00 per acre for forty thousand acres of land in the upper valleys.[21] UVDs, however,

---

**19.** The United States holds the right on behalf of the San Carlos Apache and other Indians of the San Carlos Indian Reservation, to divert 6,000 AF at a rate of up to 12.5 cfs. The priority date of this right is 1846. Article VI(2). For convenience, the Court refers to this 1846 priority right as belonging to the Apaches.

**20.** The United States holds the right on behalf of the Pima and other Indians of the Gila River Indian Reservation, to divert 210,000 AF at a

rate of up to 437.5 cfs. The priority date of this right is "immemorial." Article VI(1). For convenience, the Court refers to this immemorial priority right as belonging to GRIC.

**21.** *See, e.g.,* Letter from John F. Truesdell, Chief Field Counsel, U.S. Indian Irrigation Service, to Oliver P. Morton, Special Assistant to the Attorney General (March 19, 1932) (Exhibit 212); Letter from Moore & Shimmel to Franklin Irrigation District and Virden Irrigation District

ultimately refused to pay this fee. For example, an April 19, 1933 joint memorandum signed by several of the negotiators [22] stated that "[i]n recent conferences, it has appeared that the Upper Valleys do not want, and, in fact, refuse to make any payment on account of the substituted storage feature of the decree, other than agreeing to the settlement of the suit on the lines set forth in the decree." The proposed Decree language was subsequently modified to provide for apportionments to be made in disregard of the prior rights of the United States below the reservoir, thereby excluding the Apache Tribe's 1846 right from the apportionments clause. *See* Article VIII(2). The Decree also provided, however, that UVDs would be able to purchase and transfer the Apache Tribe's right to the San Carlos Irrigation Project for $62,500, if certain conditions were met. Article VI(2). UVDs did not make this purchase. GRIC argues that the UVDs could have obtained the transfer of the Apache Tribe's right to SCIP, but chose not to, and that they must therefore bear the consequences of their decision.

The Court rejects this reasoning. First, as a practical matter, GRIC's approach renders the apportionments clause illusory. As noted above, if GRIC is permitted to exercise its immemorial priority right by virtue of the precedence the Apaches' 1846 priority has over UVDs' apportionment calls, then UVDs will be able to divert on apportionment only when flow in the river exceeds 450 cfs, regardless of the amount of water stored in the reservoir and available for use downstream. As UVDs demonstrated at trial, based on data from a twelve-year period, this approach would prevent them from irrigating during the bulk of the season. Indeed, the median flows between 1980 and 1992 at Ashurst–Hayden Dam never exceeded 450 cfs between mid-May and early December. Further, as is also noted above, when the flow in the river reaches 480 cfs, UVDs' priority rights are triggered, largely obviating the

need for apportionment calls. In effect, GRIC's interpretation of the Decree eliminates the benefit of the apportionments clause by superimposing upon it the doctrine of prior appropriation. This result is at odds both with the language of Article VIII(1) recognizing the "desirability of making it practicable" for UVDs to continue irrigating and providing that the San Carlos Act shall inure in part to their benefit, and with the historical fact that the drafters left the apportionments clause in the Decree despite what GRIC acknowledges was the UVDs' blatant refusal to pay for it. Indeed, there is nothing in the historical record or the Decree to suggest that the drafters intended the apportionments clause to be effective only when the flow in the upper valleys exceeds 450 cfs.

Second, the Court cannot agree that the historical record demonstrates that UVDs bargained for, or failed to bargain away, the "menace" of circular priorities. GRIC relies heavily on John Truesdell's Memorandum for the Commissioner of Indian Affairs and the Solicitor of the Interior Department (March 26, 1934), which refers to "[t]he plan of allowing the Upper Valleys to get rid of the menace of this San Carlos Indian right." *Id.* at 4. GRIC's argument that the "menace" to which Truesdell refers is that of circular priorities is wholly unsupported by the historical record; no reference to the problem appears in the Truesdell memo or in any other cited by GRIC. Nor can the Truesdell memo be fairly interpreted as referring to the "menace" of the San Carlos Apaches' right in the manner GRIC suggests. The first reference to a "menace" appears on the second page of the memo, where Truesdell analyzes the advantages to all parties of the proposed settlement and the substituted storage plan and states that the chief advantages to UVDs are

(November 25, 1932) (Exhibit 214); Truesdell, Memorandum for the Commissioner of Indian Affairs and the Solicitor of the Interior Department (March 26, 1934) (Exhibit 216).

**22.** Ethelbert Ward, Special Assistant to the Attorney General, Ernest W. McFarland, San Carlos

Irrigation and Drainage District (SCIDD) Attorney, Clay H. Southworth, SCIDD Engineer, Walter R. Elliot, Gila Valley Irrigation District (GVID) Engineer, and John Truesdell, Chief Field counsel for the Indian Irrigation Service.

(a) the removal of the menace of enforcement of prior rights below as long as the San Carlos Reservoir storage conditions are met, thus giving those lands a reasonably secure water right; and (b) bringing them in to an ordered administration with San Carlos Project lands and so giving them a sort of recognition and perhaps preference if further protection for them should be found feasible in the future.

*Id.* at 2. The next reference to the "menace" appears when Truesdell analyzes the Apaches' right under the proposed Decree. Truesdell acknowledges not only that the Apache did not have an irrigating history, but that the physical conditions appeared to preclude irrigation from the river at a reasonable cost. *Id.* at 4. Truesdell then states:

[S]ince there is so little prospect of the right being usable due to the physical situation of the lands on the reservation and immediately above it and the requirement of law that changes of point of diversion, etc., can only be made to the extent that they do not injure others, a plan was devised and is embodied in the decree whereby the Upper Valleys may get rid of the menace of this right if the Indians wish to sell it.

Under this plan the right would be held merely as a support to San Carlos Project and Upper Valley rights as against other claimants in the stream, but would not be used otherwise.

*Id.* Truesdell concludes "the provisions of the decree with respect to this right are meant to enlarge its usefulness and salability and provide a market for it beyond those the Government representatives thought ordinarily would be available." *Id.* at 5.

The Court is in no position to divine Truesdell's complete thoughts or intentions regarding this aspect of the Decree. The written record, in the absence of living witnesses to testify as to its meaning, is open to several interpretations. It is sufficient to note, for purposes of this issue, that Truesdell refers to any right prior to those of the UVDs as a menace and that Truesdell appears to have considered the buyout option as a potential source of protection for the UVDs from other claimants to the stream and also as a means

for the Apaches or the government to obtain something of value for the 1846 priority. Nothing in the memo, however, persuades the Court that the "menace" was that of circular priorities and that the bargaining process concerned eliminating the possibility of circular priorities.

The better interpretation of the Decree language, and the one the Court now adopts, is that water apportioned pursuant to Article VIII(2) is forfeited by and unavailable to the senior appropriators below the reservoir when that apportionment is exercised. By consenting to the apportionments clause, the United States forfeited its claim on behalf of GRIC to waters that are apportioned to UVDs. Both the language of the Decree, and the historical record compiled by the parties in connection with this litigation demonstrate that the substituted storage plan was agreed upon both to ensure that the San Carlos Irrigation Project did not merely benefit the lower valley users and to persuade the UVDs to settle what would otherwise have been a long, costly lawsuit. Furthermore, the apportionments clause, tied as it is to the storage of water available for release downstream to GRIC, does not operate to deny GRIC its benefits under the priority schedule. It merely represents a compromise agreed upon by the negotiating parties to assign certain benefits to UVDs in recognition of the fact that they are unable to store water in the reservoir.

The United States did not, however, succeed in its plan to sell the 1846 priority right of the Apaches because the UVDs refused to pay for it. For this reason, in part, an apportionment may not be taken in disregard of the rights of the Apache Tribe to 6,000 AF, as this Court has previously held. *Gila Valley Irrigation Dist.*, 804 F.Supp. at 7. It is also for this reason that GRIC cannot obtain from the Apaches what the government did not sell or otherwise bargain away in order to settle the suit. There is little logic to the argument that GRIC, rather than the Apaches, should be the primary beneficiaries of the UVDs' refusal to pay for the Apaches' 1846 right and transfer it to the San Carlos Irrigation Project.

The Court concludes, therefore, that when UVDs issue a call for an available apportionment, they need only let pass an amount sufficient to satisfy a superior call issued by the Apaches. Such a call by the Apaches is not, however, subject to a senior claim by GRIC, because GRIC's claim to water that is the subject of an apportionment is deemed forfeited pursuant to the apportionments clause. The Water Commissioner is hereby directed to ensure that the call system implemented in accordance with this Order protects both UVDs' apportionment calls and the Apaches' 1846 priority calls when GRIC issues its immemorial priority call.

## III. ARTICLE VIII(4)

■ GRIC argues that Article VIII(4) stands for the proposition that there must be sufficient water stored for the irrigation of 80,000 acres of land before the Water Commissioner may apportion any water to UVDs.[23] This issue was first argued at a hearing in May of 1993. The Court deferred the issue pending further discovery, noting the parties had not briefed the issue and that UVDs were unaware prior to the hearing that GRIC intended to frame the issue in this manner. The parties' arguments at that hearing left the Court with the impression that the language of Article VIII(4) was "arguably subject to multiple interpretations." *United States v. Gila Valley Irrigation District*, Globe Equity No. 59, Memorandum and Order at 22 (September 23, 1993).

Article VIII(4) provides:

That water released at the will of the plaintiff and for the purposes of the plaintiff from the San Carlos Reservoir at any time after the date of this decree other than for the proper irrigation of 80,000 acres of land or its equivalent in the San Carlos Project, shall be considered as stored in the San Carlos Reservoir at and after the date of such releases, and available as a basis for the above described apportionment of the natural flow to said defendants as it would be if such withdrawals had never been made.

GRIC argues that this text can be read to say, in substance, that "water in the San Carlos Reservoir is available as a basis for apportionment only to the extent such water is more than that needed for the proper irrigation of 80,000 acres." Gila River Indian Community's Post Trial Brief: Article VIII(4) at 17. Put another way, GRIC argues that Article VIII(4) defines "stored water." Pursuant to this definition, no water in the San Carlos Reservoir is treated as "stored" until there is sufficient water to properly irrigate 80,000 acres of SCIP lands.

With the benefit of briefing, the Court concludes that GRIC's argument must be rejected as contrary to the plain language of the Decree. The language of Article VIII(4), whether standing alone or taken in context with the remainder of the article, is relatively plain. Certain aspects of Article VIII(4) are quite clear. First, the article refers to "water *released at the will of the plaintiff* and *for the purpose of the plaintiff . . . other than for the proper irrigation of 80,000 acres.*" There can be little serious debate that the phrase "other than" refers, in this context, to "purpose"; that is, this language refers to water released for purposes other than the irrigation described. Second, the article provides that the water released as described "*shall be considered as stored* in the San Carlos Reservoir at and after the date of such releases, *and available as a basis for the above described apportionment . . . as it would be if such withdrawals had never been made.*" This language is not particularly mysterious in its reference to stored water serving as the basis for an apportionment, and merely makes it plain that if plaintiffs release water for the delineated "other" purposes, whether those purposes are unrelated to irrigation or are for the irrigation of something more than 80,000 acres, the water will be charged as though it had remained in the reservoir.

Construing Article VIII(4) according to its plain language is also consistent with the remainder of the article. Article VIII(2) provides, in part:

**23.** UVDs argue that the issue presented here is *res judicata*. The Court disagrees. UVDs cite to no decision on the precise question presented by

GRIC that would preclude analysis of it at this time.

That *on the first day of January of each Calendar year, or as soon thereafter as there is water stored in the San Carlos Reservoir, which is available for release* through the gates of the Coolidge Dam for conveyance down the channel of the Gila River and for diversion and use on the lands of the San Carlos Project for the irrigation thereof, then *the Water Commissioner, provided for herein, shall, to the extent and within the limitations hereinafter stated, apportion* for the ensuing irrigation year to said defendants from the natural flow of the Gila River *an amount of water equal to the above described available storage,* and shall permit the diversion of said amount of water from said stream into the canals of said defendants for the irrigation of said upper valleys lands in disregard of the aforesaid prior rights of plaintiff used on lands below said reservoir; . . . .

(Emphasis added.) The balance of Article VIII(2) is set forth in several clauses separated by semicolons. These remaining clauses provide, in part, that (1) UVDs' diversions on apportionments are "in addition to and not exclusive of" their priority rights, within the duty limitations of the Decree, (2) the Water Commissioner shall make supplemental apportionments when there are "accessions or newly available stored water," (3) the Water Commissioner shall make appropriate deductions for losses due to evaporation and seepage, (4) the Water Commissioner shall make supplemental apportionments at least once per month, if there are accessions to stored water, (5) no apportionments shall carry over to the succeeding year, (6) UVDs' diversions shall be regulated according to their relative priorities and shall not exceed 6 AFA, and (7) UVDs' diversions shall be limited to an actual consumptive use of no more than 120,000 AFA.

Under GRIC's analysis, it is impossible to reconcile Article VIII(2) and Article VIII(4). Article VIII(2) requires that the Commissioner make an apportionment on the first day of the year (or as soon as possible thereafter) and that the Commissioner declare supplemental apportionments at later dates when there have been accessions to the stored water. Article VIII(4), however, provides that certain water shall be considered as stored "at and after the date of . . . releases." If Article VIII(4) is construed as the sole definition of stored water, then no apportionment could be declared until after the releases occurred. This is plainly at odds with the requirements of Article VIII(2) that apportionments be declared when stored water is "available for release."

GRIC argues that Article VIII(2) invites limitation according to Article VIII(4) by providing that the Commissioner "shall, *to the extent and within the limitations hereinafter stated,* apportion" water to the UVDs. Two other provisions, however, caution against interpreting this phrase as directing the Commissioner to find the definition of "stored water" in a subsequent paragraph. First, Article VIII(2) directs the Commissioner to apportion "an amount of water equal to the *above described* available storage" on the first day of January or as soon as possible thereafter. The only storage described "above" this passage is that in the first two lines of the paragraph. These lines refer to "water stored in the San Carlos Reservoir, which is available for release through the gates of the Coolidge Dam for conveyance down the channel of the Gila River and for diversion and use on the lands of the San Carlos Project for the irrigation thereof." In other words, Article VIII(2) incorporates definitional language prior to its reference to the "above described available storage." Second, Article VIII(4) expressly states that the water released for purposes other than the irrigation of 80,000 acres serves as "*a* basis" for apportionment, not the only basis for apportionment. Furthermore, the phrase on which GRIC relies falls squarely between the words "shall" and "apportion," suggesting that the limitations are imposed upon the Commissioner's duty and discretion to apportion water, rather than that the limitations are of a definitional nature set forth in another paragraph. That the succeeding clauses of Article VIII(2) indeed set forth limitations related to apportioning and diverting water further bolsters the Court's interpretation.

In addition to arguing the literal meaning of Article VIII(4), the parties submitted considerable briefing and evidence concerning the intent of the parties. Having reviewed the relevant portions of the voluminous historical record compiled with obvious care by several of the parties, the Court acknowledges that although there are highly conflicting indications in different memos, letters, and documents, there is abundant evidence that at least some of the negotiators considered that the Decree should be drafted to ensure that the defendants would be entitled to apportionments only when there was sufficient water stored in the San Carlos Reservoir to meet the irrigation needs of the Project lands. The Court is constrained to conclude, however, that this historical documentation is unavailing because the language of Article VIII(4), particularly when considered in light of the well-established meaning of Article VIII(2), is unambiguous. *See ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); *Gila Valley Irrigation District*, 961 F.2d at 1440.

### IV. COSPER'S CROSSING

Cosper's Crossing is a crossing point on the Gila River located within the Arizona portion of the Duncan–Virden basin, between Sheldon and York. Periodically, the riverbed at the crossing becomes dry, although the river may be flowing at distances both above and below Cosper's Crossing. Irrigators in the Safford Valley and the Duncan–Virden Valley have for many years informally agreed to allow the Duncan–Virden irrigators above Cosper's Crossing to divert the entire flow of the Gila River when there is no surface flow at Cosper's Crossing. Other parties to the Decree challenge this practice as violating the Decree.

The Cosper's Crossing "condition" or "regulation" is monitored by the Water Commissioner. During the summer months, when the flow in the Gila is intermittent, the Commissioner will, upon notification and visual inspection, allow the decreed users in the Duncan–Virden Valley to divert apportioned water in disregard of the prior rights to apportioned water of the Safford Valley users. The process generally begins when a user in the Duncan–Virden Valley contacts the Water Commissioner's office to announce that the river has gone dry at the crossing. The Commissioner or an assistant travels to Cosper's Crossing to verify that there is no flow. At that time, the Commissioner's office authorizes the diversion of the entire stream flow in the Duncan–Virden Valley above the crossing point, until such time as the river flows again at Cosper's Crossing. No entry or notation in the Water Commissioner's books or annual reports memorializes the declaration of the Cosper's Crossing condition. A reconstruction of the Commissioner's records demonstrates that diversions in the Duncan–Virden Valley pursuant to the Cosper's Crossing condition have averaged about 1000 AF over the last 20 years. *See* Stetson Engineers, *Preliminary Investigation of Cosper's Crossing Condition*, Table 6 (September 13, 1994) (hereafter "Stetson Cosper's Crossing Report").

The transfer of diversion rights from Safford Valley irrigators to Duncan–Virden Valley irrigators enjoys a long history in the management of the Gila River. Article VIII(3) of the Decree provides:

Upon agreement made by the owner of any right set forth in the Priority Schedule for land in the Safford Valley water may be diverted by the owner of land in the Duncan Valley within the duty of water in this decree set forth and within the apportionment of water for said Duncan Valley land in disregard of such Safford Valley right or rights, and that such waiver shall in no way deprive the Safford Valley lands thus waiving of their full apportionment of water herein provided for based on water stored in the San Carlos Reservoir or their full right to take from the stream, in accordance with their priority and within the duty of water fixed by the decree as against water rights of the United States held on account of the San carlos Project, but the right of the United States to insist upon its priorities as defined and modified herein as against Duncan Valley Lands shall not be abridged by this provision.

In 1936, Commissioner Charles Firth reported that, upon the written request of the

Gila Valley Irrigation District (GVID), he had permitted diversions in the Duncan Valley in excess of the users' priority rights, due to low flow in the river. First Annual Report, Distribution of Water of the Gila River, at 14 (Dkt. 252). The Commissioner stated that "[t]he reason for this request was that it was believed that if water would be turned down the river channel from the Duncan Valley for the benefit of senior rights in the Safford Valley, that this water would become lost by evaporation and seepage and would not reach the canals of the Safford Valley." *Id.*

Later, in April of 1937, the GVID, the Franklin Irrigation District (FID), and the Sunset Canal Company executed a written agreement to permit the FID users to divert out of the order of their priorities. *See Stetson Cosper's Crossing Report* 8–10 (reproducing agreement as found in the 1937 Annual Report of the Gila Water Commissioner).[24] This agreement expired in 1940, but the GVID and the FID renewed their commitment orally at a joint board meeting in April of that year. The minutes of that meeting state that "it was verbally agreed between the two districts that when the flow of the water was not sufficient to reach the first diversion dam in the Gila Valley that all of the water could be used in the Duncan Valley." Minutes of the Joint Board, April 23, 1940 (Ex. 48).

There is no dispute that these diversions in the Duncan–Virden Valley continued after 1940, although no formal agreement existed between the affected parties. Beginning in the early 1950s, the Commissioner began using the designation "Immem.'" to represent certain "priority" diversions in the Duncan Virden Valley. These "priority" diversions were authorized on the basis that the water was unlikely to reach the downstream users and would therefore be wasted. This Court "enjoined the diversion of water under the cover of the fictitious 'Immem.'" priority in 1969 and the court of appeals affirmed. *Gila Valley Irrigation District,* 454 F.2d at 221–22. The Ninth Circuit reiterated what this Court had held; namely, that the Commissioner was enjoined from "permitting water, *other than apportioned water,* to be diverted as against the water rights of plaintiffs *except* in strict accordance with the priority schedule set forth in Article V of the Decree." *Id.*

Plaintiffs argue that the Cosper's Crossing condition, as it is now employed, violates the Decree. First, plaintiffs argue that there is no agreement as contemplated by Article VIII(3). This argument is unpersuasive. The Decree expressly authorizes the owner of a decreed right in the Safford Valley to waive his or her prior right to apportioned water for the benefit of a landowner in the Duncan–Virden Valley. Article VIII(3). The Court rejects the argument that Article VIII(3) requires a written agreement or agreements executed by each individual landowner in the valleys; the Decree merely contemplates a valid agreement waiving the prior right to divert on apportionment, so long as the other conditions of the Article are met. There is no evidence that any of the individual owners of decreed water rights in the upper valleys object to the Cosper's Crossing practice. Therefore, the Court concludes that the irrigators of the Safford and Duncan–Virden Valleys may express their agreement, if they so choose, through their respective canal companies, irrigation districts, or such other organizations or associations they authorize to act as their agents for this purpose.[25] Nor can the Court agree that there is no agreement in place currently. Whatever defects in form the purported 1940

**24.** This agreement refers not to Cosper's Crossing, but to Fuller's Ranch. Unlike Cosper's Crossing, Fuller's Ranch is equipped with a gauge, which is now known as the Blue Creek gauge.

**25.** The Court need not, and does not, make any finding here as to whether the individual landowners and irrigators of the Safford and Duncan–Virden Valleys have agreed to be bound by the decisions of their canal companies or irrigation districts, as no party has raised or briefed the issue, and no party with standing has objected to the form of agreement presented to the Court. While plaintiffs have standing to argue that the Cosper's Crossing practice abridges their rights to insist upon their priorities, the Court concludes that only the individual irrigators bound by the agreement between the GVID and the FID have standing to object on the basis that they should not be so bound.

oral agreement may have suffered have been addressed by the agreement executed in January of this year by the GVID and the FID. That agreement specifically binds the GVID and the FID to the Cosper's Crossing practice and limits the practice to apportioned water and to the water duty set forth in the Decree.[26] The Court concludes, therefore, that the owners of decreed rights in the Safford Valley have agreed, pursuant to Article VIII(3), to waive their right to insist upon their priorities, as between themselves and the Duncan–Virden Valley irrigators, with respect to apportioned water when Cosper's Crossing is dry.

Plaintiffs also argue that the Cosper's Crossing practice deprives them of water to which they are entitled under the Decree. Article VIII(3) forbids the diversion of the stream out of the order of priorities in the upper valleys, regardless of the nature and scope of the agreement involved, if such diversion abridges "the right of the United States to insist upon its priorities as defined and modified herein as against Duncan Valley Lands." The crux of plaintiffs' argument is that the Cosper's Crossing practice abridges their right to insist upon their priorities because: (1) under the practice, the Duncan–Virden irrigators get more water than they would if there were no agreement; and (2) if the practice were discontinued, the water above Cosper's Crossing would continue to flow downstream.

The evidence at trial demonstrated that although there may be no surface flow at Cosper's Crossing, there is subsurface flow as little as 12 to 18 inches below the riverbed. This subsurface flow travels down-gradient much more slowly than water flowing above ground, but there is no credible argument that it is not, in fact, part of the flowing stream. It was also established at trial that the existence of a dry condition at Cosper's Crossing at times when the river flows on the surface at points both above and below Cosper's Crossing is caused in substantial part by the geology of the region. Cosper's Crossing lies in an area between two constricting geologic formations. The upper constriction (upstream from Cosper's Crossing) inhibits subsurface flow from entering the reach of the river where Cosper's Crossing is located. The flow is forced to the surface to overcome the barrier, but then tends to sink into the sandy soils of the riverbed once it enters the reach where Cosper's Crossing is located. The lower constriction (downstream from Cosper's Crossing) similarly restricts the subsurface flow, forcing the flow to return to the surface of the river. See Gookin Technical Report, ch. 4, at 9–10. Cosper's Crossing can therefore be dry on the surface although the river is flowing at distances upstream and downstream from the crossing. This natural effect is likely exacerbated, as plaintiffs point out, by pumping from the groundwater in the region. Id. at 23–27. See also Stetson Cosper's Crossing Report 28–36, 39–42. Diversions and pumping may contribute to "dewatered storage" in the area and to the dry condition at Cosper's Crossing. Plaintiffs claim that Cosper's Crossing would dry up less frequently (and perhaps not at all), and would be recharged more rapidly, if such pumping did not occur. Plaintiffs also argue simply that, by virtue of the agreement and the diversions in the Duncan–Virden Valley, the flow in the Gila River is diminished and 1846 priority calls by the Apache Tribe cannot be satisfied.

None of these arguments, however, state a sufficient basis for abolishing the Cosper's Crossing practice. As a threshold matter, the Court notes that the Decree expressly authorizes the type of agreement at issue here, so long as it is confined to apportioned water and so long as the other provisions of the Decree are not breached. If the Safford

---

**26.** The Agreement provides, in part, that:

GVID and FID agree that when it is observed by the irrigators in the Duncan–Virden Valley that the river has ceased to flow at Cosper's Crossing, then the Gila Water Commissioner shall be notified so that a representative from the Commissioner's office can visually verify that the dry condition is in effect. When the Commissioner's office determine that the dry condition is in effect, the Sunset, New Model, and Valley canal companies will be notified of a new regulation date which will allow them to divert the entire flow of the Gila River into the three canals. This agreement applies only to "apportioned water" as contemplated by Article VIII(3).

Valley irrigators decide to waive their prior rights to apportioned water on, say, every other Monday during the irrigation season, they are free to do so. Such an agreement does not violate the Decree simply because it means the Duncan–Virden Valley users obtain more water than they would if there were no such agreement. The upper limits on the water duty and apportionment rights, including the 6 AFA limitation, the ⅛oth cfs per acre diversion limitation, and the consumptive use limitation, all operate to protect plaintiffs' priority rights.

As to the argument that the dry condition at Cosper's Crossing is caused by pumping, the Court concludes that the issue must be left for another day. If the Court is to determine that the Duncan–Virden irrigators violate the Decree by pumping groundwater, it will be due to the proscription of groundwater pumping in general, not due to the possible contribution of pumping to the dry condition at Cosper's Crossing. The question of whether pumping in the upper valleys deprives plaintiffs of water to which they are entitled under the Decree has been stayed pending the outcome of the General Stream Adjudication in the Arizona state court. *See United States v. Gila Valley Irrigation Dist.*, Nos. 90–16720, 90–16721, 1992 WL 66650 (9th Cir.1992). The Court will not address indirectly, through reference to the Cosper's Crossing condition, an issue that has been stayed.

However, the Court agrees with plaintiffs that, to the extent that the diversion of the stream pursuant to the Cosper's Crossing agreement diminishes the flow such that an 1846 call by the Apaches is compromised, it is in violation of Article VIII(3). If the Apaches issue an 1846 priority call, the Commissioner must cease diversions, as necessary, throughout the upper valleys until such call is satisfied. Whether this means that no water may be diverted in the Duncan–Virden Valley, or that only some water may be diverted there, is a matter the Court leaves for the moment to the Commissioner's judgment. The Court notes, however, that FID has not demonstrated that when Cosper's Crossing is dry on the surface, water is not continuing to flow under the surface. Absent sufficient proof that the stream is not continuing to flow downstream under the surface and that the flow visible above Cosper's Crossing would not, if allowed to pass undiverted, reach the Safford Valley, the Court concludes that FID may not divert the entire flow of the stream under a Cosper's Crossing regulation in the face of a prior call by the Apaches.

The plaintiffs also argue that the Cosper's Crossing practice is declared and monitored in an arbitrary manner. The Court agrees with plaintiffs that the proper administration of the Decree requires, at a minimum: (1) that the agreement be in writing and specify in some detail the prevailing conditions under which the Commissioner will allow Duncan–Virden Valley users to divert apportioned water in disregard of the prior rights of Safford Valley users; (2) that the Commissioner or the parties agreeing to the practice provide for a reliable mechanism by which the Commissioner will be informed not only of when Cosper's Crossing is dry on the surface but when it is flowing on the surface; and (3) that the Commissioner document the practice in such a way that it is clear when apportioned water is being diverted upstream from the Safford Valley under the Cosper's Crossing agreement. The Court also notes that the FID and the government seem to agree that administration of the Decree might be improved by relocating the trigger point for the Cosper's Crossing agreement to the gauge at Blue Creek. The Court declines, at this stage of the proceedings, to order such a relocation, but strongly encourages the parties to consider modifying the practice in ways that would both ease the administrative burden on the Commissioner and promote a higher degree of accountability.

## V. ARTICLE VIII(5)

■ There are two pending issues related to Article VIII(5). First, GRIC argues that Article VIII(5) prohibits UVDs from diverting apportioned water when there is no water stored in the reservoir and available for release. Second, the Apache Tribe moves for reconsideration of this Court's prior holdings that Article VIII(5) does not require UVDs

to exhaust their apportionment rights before diverting water on priority.

## A.  Lack of Available Storage

GRIC argues that, under Article VIII(5), UVDs are prohibited from diverting apportioned water from the river either (1) when there is a lack of available storage, or (2) when apportionments previously made to UVDs have been consumed.  Under GRIC's analysis, UVDs would not be permitted to divert on apportionment, even though an apportionment had been declared by the Water Commissioner, unless there was water presently available in the San Carlos Reservoir for release downstream.  Nor, of course, would UVDs be permitted to divert on apportionment when all of their prior apportionments had been consumed.[27]

Article VIII(5) provides:

> PROVIDED ALWAYS, that if by reason of lack of available storage in the San Carlos Reservoir no apportionment of the natural flow of said river is or can be made available to said defendants, then the diversions of said defendants, *of or as soon as apportionments previously made to them have been consumed,* shall no longer be made in disregard of the prior rights of plaintiff below said San Carlos Reservoir, but shall instead be made under and in accord with the rights and priorities set down in Article V, and the Priority Schedule made part hereof, and Article VI of this decree to wit: in accord with their several priorities as same are set down in said Priority Schedule and subject to the prior rights of plaintiff as same are referred to therein and further described in Article VI of this decree.

(Emphasis added.)

GRIC's analysis must stand or fall on the meaning of the phrase "of or as soon as apportionments previously made to them have been consumed."  GRIC asserts that the word "of" in this phrase is a clerical error, and that the "or" marks the beginning of a disjunctive phrase setting forth one of the two conditions under which diversions "shall no longer be made in disregard of the prior rights of plaintiff" below the reservoir.  This argument suffers from two serious flaws.  First, there is no evidence that the word "of" was included by mistake.  In fact, it appears in every draft version of the Decree to which the Court's attention has been directed.  Second, even if the clerical error theory were accepted, GRIC's interpretation of the conditional clause is grammatically anomalous.  The proviso is constructed as a conditional "if-then" clause: "if, by reason of . . ., then the diversions. . . ."  GRIC's interpretation that the condition precedent or antecedent is compound in nature—"if $x$ or $y$, then . . ." can be achieved only by ignoring the placement of the conjunction "or" squarely within the consequent "then" phrase, and in fact, between the subject and the predicate of the consequent phrase.  Such a construction is highly inconsistent with both logic and basic grammar.  The Court is unwilling to ignore the plain language of the Decree and assume not only that the drafters made the particular clerical error suggested by GRIC, but also that they included a proviso so obscure as to escape notice for sixty years.

It far more likely that the interpretation given to this article since the inception of the Decree, and the interpretation most readily apparent from the plain language, was intended by the drafters.  Although the phrase "of or as soon as" is not elegantly constructed, the language is unambiguous in its direction that UVDs must cease diverting apportioned water when the "apportionments previously made to them have been consumed."  In other words, the lack of available storage prevents the *declaration* of an apportionment, not the *diversion* of an apportionment that the Water Commissioner has already declared.  The Court notes, moreover, that this interpretation is harmonious with the interpretation of Article VIII

---

27.  UVDs moved, prior to trial, for the dismissal of this "issue."  Considering the Court's role in the ongoing supervision of the Decree and the comparatively late arrival of the Gila River Indian Community and the Apache Tribe as intervenors, the Court is reluctant to preclude the litigation of an issue which might theoretically have been raised earlier in the proceedings.  Nor can the Court agree that this issue has already been decided, as it is clearly a novel argument for the limitation of diversions on apportionment in the Upper Valleys.

appearing in Article IX, which sets forth a method for apportioning water to the Kennecott Copper Corporation. Article IX(6) states:

> PROVIDED ALWAYS, that the foregoing provisions of this Article IX are hereby explicitly made subject to *the proviso that whenever under Article VIII hereof, by reason of lack of available storage in the San Carlos Reservoir and the consumption of previous apportionments thereunder, no apportionment of the natural flow of said river is or can be made available to the so-called upper valleys defendants* in disregard of the prior rights of plaintiff below said reservoir, and therefore diversion by said defendants and plaintiff are required to be made under and in accord with the rights and priorities set down in Article V (and the Priority Schedule therein) and VI of the decree, then the diversions of defendant, as against all the other parties in this cause, whether for industrial, municipal domestic and related purposes as described in subdivisions (1) to (3) above—or for irrigation as described in subdivisions (4) and (5) if or when its apportionment in that relation also has been consumed—shall be subject to and be made in accord with its priorities as same are stated in the Priority Schedule and not otherwise. . . .

(Emphasis added.) *See also* Article X(3). Viewed in context, Article VIII(5) is a proviso, not unusual in the construction of statutes and decrees of this sort, that operates as a savings clause or a reminder that when water cannot be apportioned to UVDs because there is no water stored in the reservoir, the parties must revert to the priority schedules. Such a savings clause does not operate, absent some express language, to take away from UVDs the apportionments that were granted according to the other provisions of Article VIII.

### B. Motion for Reconsideration

The Court has twice during this litigation held that Article VIII(5) does not require UVDs to exhaust their apportionments before diverting water from the natural flow of the Gila River according to their priority rights. In 1992, this Court held that "[w]hen water is apportioned to UVDs, they may divert on these apportionments. When the apportionments are exhausted, or cannot be made due to lack of available storage, UVDs must revert to diverting only on priority." *Gila Valley Irrigation District,* 804 F.Supp. at 13.

The Apache Tribe raised the issue again and the Court attempted to clarify that "the above quoted language merely states that priority water is available when apportioned water is exhausted or when no water is stored in the reservoir, and does not preclude the use of diverted and apportioned water simultaneously." *Gila Valley Irrigation District,* Memorandum and Order at 8 (September 23, 1993).

Lest there be any remaining confusion, the Court reiterates that Article VIII(5) does not require that UVDs exhaust their apportionments before diverting priority water. If UVDs have an apportionment available, they may divert on apportionment. If priority water is available to UVDs, such as would be the case if, for example, there were enough water to satisfy prior calls of GRIC and the Apache Tribe, UVDs are free to divert on priority and use the apportionment at a later time.

The Apache Tribe argues that a call system cannot be implemented if UVDs can override a senior call by diverting on apportionment. This argument is unpersuasive. First, the purpose of the apportionments clause is to allow UVDs to divert water, up to the limits set forth in the Decree, in disregard of the senior rights of the United States below the reservoir. It is therefore not only plausible, but a requirement, that a call system provide for the satisfaction of an apportionment call prior to the satisfaction of a priority call placed by GRIC. In other words, the call system must be implemented in such a way that UVDs can override GRIC's senior call if UVDs have an apportionment available to them. Second, the Court sees no barrier to the implementation of a call system that encompasses UVDs' apportionment rights. The Apache Tribe has not demonstrated that a call system cannot be structured to include apportionment

calls, and the Court is aware of no logical obstacle.

The Apache Tribe's motion for reconsideration on this issue is therefore denied.

## VI.  TRANSIT & SEEPAGE LOSSES

Article VIII(2) of the Decree requires "that in calculating apportionments of the stored water supply the Water Commissioner shall make appropriate deductions for losses for evaporation, seepage or otherwise that may be suffered between the time of the apportionment and that of the diversion of a corresponding quantity of water from the stream." In 1990, this Court held that the Commissioner must make deductions for both transit losses between Coolidge Dam and Ashurst–Hayden Dam and seepage losses, and directed the Commissioner to propose a method for calculating such losses. The court of appeals affirmed. *Gila Valley Irrigation District,* 961 F.2d at 1438. The parties then established a Technical Committee to analyze the issues of transit and seepage losses and to make a recommendation to the Water Commissioner and, ultimately, the Court, regarding the appropriate deductions. The Technical Committee comprises non-lawyer technical consultants representing the interests of GRIC, UVDs, the San Carlos Irrigation and Drainage District (SCIDD), the United States, and the Bureau of Indian Affairs (BIA).

### A.  Transit Losses

■ The Technical Committee reached agreement on certain issues related to deductions for transit losses between Coolidge Dam and Ashurst–Hayden Dam. The parties agree that the primary loss in transit is caused by the consumptive use of water by phreatophytes. There is also a comparatively minor loss caused by leakage to the groundwater. The committee also agreed that the total transit loss from Coolidge Dam to Ashurst–Hayden Dam is approximately 42,000 AF per year.[28] Some of this loss, however, is attributable only to inflows from

tributaries and, as such, should not be deducted from apportionments to UVDs. The Committee determined that the transit loss attributable only to releases from the Coolidge Dam is approximately 30,000 AF. *See* T.A.J. Gookin, *Seepage and Transit Loss Deductions from Apportionments* 2, Appendix (October 6, 1994) (hereafter "Gookin Seepage & Transit Report").

Beyond these matters, the agreement among UVDs' expert and the others of the Technical Committee breaks down. The Committee and the Water Commissioner disagree on the best method for deducting transit losses. The Water Commissioner currently deducts 15% of stored water for transit losses. Neither UVDs nor the Technical Committee believe that this value is appropriate. UVDs argue that the percentage deduction should be significantly smaller, while the others of the Technical Committee argue that the deduction should be a prorata share of the total 30,000 AF lost in transit.[29]

The Court agrees with the majority of the Technical Committee members that the Water Commissioner's deduction for transit losses should be a pro-rata share of the total amount lost in transit between Coolidge Dam and Ashurst–Hayden Dam, as opposed to a percentage of the amount of stored water. The problem with using a percentage value is that it does not accurately reflect the true consumptive use of the phreatophytes. To put it anthropomorphically, the salt cedars do not care whether the Dam releases 100,000 AF or 400,000 AF—in either case, they will consume about 30,000 AF of the water released over the course of the year. The use of a percentage deduction may, over a number of years, represent a fair average of the transit loss, but it will severely understate the loss in dry years, the effect of which is an over-apportionment of water to UVDs. That this understatement of transit losses in dry years is balanced out by a corresponding overstatement in wet years is of little value

---

28. This estimate was derived using consumptive use data for alfalfa, a phreatophyte whose thirst is better documented than salt cedar's.

29. The Technical Committee prepared a table depicting the proposed distribution of the transit loss on a monthly basis. Because the phreatophytes consume greater amounts of water in the summer months, the pro-rata shares are largest during those months. *See Gookin Seepage & Transit Report,* Appendix.

to the lower valley users, because in those years they are protected by the upper limits on apportionments.

UVDs argue that their apportionments should not be charged with a pro-rata share of 30,000 AF, because that value represents losses to both stored water released and natural flow released. UVDs assert that the appropriate deduction is 63% of the 30,000 AF value, adjusted on a pro-rata basis, because roughly 37% of the water lost in transit to phreatophytes is natural flow released from the Coolidge Dam. The Court agrees with UVDs that only stored water released is to be charged with transit losses. However, the proposal recommended by the majority of the Technical Committee results in no unfair charge to apportionments for natural flow lost in transit, because the proposal takes advantage of the Commissioner's idealized approach to calculating the duration of a given amount of storage.

It is undisputed that the Commissioner's method for deducting evaporation losses (which is the method recommended by the majority of the Committee for deducting transit losses) involves estimating the period of time in which a given amount of stored water will be released for use downstream. This estimate is based on historic records of storage levels and releases. In making this estimate, however, the Commissioner does not factor in the effect of inflows of natural flow water to the reservoir. Because these uncounted inflows affect the period of time in which the stored water will actually be released, the Commissioner's estimate of the time in which the stored water will be released is artificially short. In other words, the idealized assumption, for purposes of calculating evaporation and transit losses, is that stored water only is released first, and that the natural flow water is released later. The effect of employing such a construct is that while the stored water bears the total transit loss for the estimated period of time in which it would be released, the undocumented natural flow water bears the total transit loss over the period of time in which it is released. *See* Tr. 743–745 (November 10, 1994). Although this construct is artificial, it results in no charges to apportion-

ments beyond that which is actually tied to releases of stored water.

The Court therefore directs the Water Commissioner to employ the method previously recommended by the majority of the Technical Committee for calculating transit losses, namely, the pro-rata distribution of a 30,000 AF transit loss each year.

## B. Seepage Losses

Pursuant to this Court's earlier order, the Water Commissioner developed a method for deducting losses due to seepage from the reservoir. The Commissioner's study determined an overall average seepage loss of 7.25% of the water stored. GRIC and the Apache Tribe argue that the Commissioner's calculation is inaccurate because it is based on data that do not represent actual losses due to seepage. These parties urge the adoption of the Gookin proposal, which is based on an extensive study performed by the United States Geological Survey. UVDs also reject the Commissioner's analysis and favor the adoption of Dr. Matlock's approach to calculating seepage losses.

The Court agrees with these parties that the Commissioner's analysis is not the most reliable. The Commissioner calculated the 7.25% seepage loss with reference to 54 years of "bank storage" and "bank release" data in the Annual Reports of the Gila Water Commissioner. There is no serious dispute that the Commissioner uses the terms "bank storage" and "bank release" to refer to something different from what hydrologists refer to with these terms. In hydrology, "bank storage" refers to water absorbed by the soils surrounding a reservoir during times of a rising reservoir, while "bank release" refers to the water that is released into the reservoir as the level of water falls. *See Gookin Seepage & Transit Report* at 8. But the Commissioner's annual reports use the concepts of bank storage and bank release to account for the difference between measured inflows to the reservoir and measured outflows from the reservoir. *Id.* As Commissioner Greiner acknowledged previously, the bank storage and bank release amounts could represent water lost to the banks or could simply be the result of an accumulation of errors. *Id.* (quoting Deposition of George

Greiner at 62–63, 86–87). Furthermore, as Commissioner Weesner acknowledges, under his approach, unmeasured reservoir gains due to groundwater inflow and tributary inflow downstream from the Calva and Peridot gauges do not offset the calculated loss to bank storage. Letter from Donald Weesner to Alfred Cox (September 8, 1992). Thus, the Commissioner's approach may significantly understate the actual loss due to seepage.

The Gookin proposal is to estimate seepage losses at 11.3%. Unlike the Commissioner's proposal, Gookin relies on the more extensive research of the Gila River system performed by the USGS. Specifically, the Gookin proposal draws on the results of a comprehensive water-budget analysis summarized in Geological Survey Professional Paper 655–N: Frank P. Kipple, *The Hydrologic History of the San Carlos Reservoir, Arizona, 1929–71, with Particular Reference to Evapotranspiration and Sedimentation* (1977) (hereafter "655–N"). This study is particularly useful because it embodies not only the same gauge measurements used in the Commissioner's reports, but also incorporates a substantial amount of information gained from field investigations and analysis of effects including precipitation, tributary inflow, and groundwater inflow. The Court is persuaded that the Gookin proposal, with its reliance on 655–N, provides a more accurate analysis of the true loss to seepage, including the loss of water in the reservoir to evapotranspiration by phreatophytes in the reservoir area.

UVDs' primary objection to the Gookin proposal of deducting 11.3% for seepage loss is that it assumes that all inflow measured at Calva and Peridot is stored. The Court agrees that not all of this water is stored and not all of it is used as the basis of an apportionment. However, as GRIC notes, one of the Commissioner's two methods for calculating apportionments involves determining the amount of stored water released based on the difference between the inflow to the reservoir measured at these gauging stations

and the outflow measured at the gauge below Coolidge Dam. *See Gila Valley Irrigation Dist.*, 961 F.2d at 1435–36. Given that these inflow and outflow measurements provide the data for determining "stored water released" and making associated apportionments, the territory in between them should likewise serve as the basis for calculating seepage and evapotranspiration loss. The Court holds, therefore, that when the Commissioner relies on the "stored water released" method for determining an apportionment, he should employ the Gookin method for determining seepage.

It is less clear that the Gookin method is accurate when the Commissioner makes the initial apportionment on the first day of the year. That apportionment, as UVDs argue, is frequently determined by using the height of the water in the reservoir to calculate the storage capacity available.[30] This method of determining storage does not suffer from the same defects as the "stored water released" method. Because this method does not count all inflows from the Calva and Peridot gauges for purposes of determining storage, it need not factor in the entire loss to seepage and evapotranspiration for that range (except in the unlikely event that the reservoir reaches all the way to the gauging stations). Indeed, to charge the full 11.3% for seepage to water stored, when measured by reference to the height and capacity of the reservoir, would inappropriately tax apportionments for phreatophyte consumptive use of natural flow above the reservoir.

For this reason, the Court must hold that the Gookin proposal of deducting 11.3% for seepage and related evapotranspiration cannot be employed when the Commissioner uses a method other than "stored water released" (or any similar method that ties "storage" to inflows at the gauging stations) for purposes of apportioning water. Unfortunately, none of the proposals advocated provides a particularly sound basis for determining seepage and evapotranspiration loss-

---

**30.** This method is referred to as "Method 1" in *Gila Valley Irrigation Dist.*, 961 F.2d at 1435. This method is also occasionally used by the commissioner when making supplemental apportionments.

es from the water stored in the reservoir.[31] The Court concludes that the Commissioner's initial proposal of a 7.25% deduction for seepage shall be applied when the basis for determining storage is the height of the water and the corresponding capacity of the reservoir. This direction shall remain in effect until such time as the parties present for the Court's approval a reliable mechanism for determining seepage and evapotranspiration losses to the reservoir. When the Commissioner calculates "stored water released," however, and declares an apportionment using a value for "stored water released," he shall use a factor of 11.3% to calculate seepage and related evapotranspiration loss.

## VII. GILA CROSSING LANDS

The Gila Crossing District is located downstream of the Ashurst–Hayden dam in the vicinity of the confluence of the Santa Cruz and Gila Rivers and above the confluence of the Salt and Gila Rivers. The irrigable lands there on the Gila River Indian Reservation apparently take their name from the nearby point where, in times past, Southern Pacific Railway crossed the Gila River above the confluence of the Gila and the Salt. GRIC argues that the Decree provides specified Gila Crossing lands with priority rights that must be enforced as against all other parties to the Decree, just as other calls are enforced and administered. GRIC also argues that there is a clerical error in Article VI(6) related to the Gila Crossing lands, and requests that the Court amend the article.

### A. Diversion Rights for Gila Crossing

Article VI(6) provides that the plaintiff owns:

> The right, as against and only against the parties to this cause, to divert from the Gila River 17,950 acre feet of water,—for the irrigation of 2992.5 acres of Indian lands at the Gila Crossing District on said

Reservation—each irrigation season at a rate of diversion not exceeding 37.4 cubic feet per second of time, *from the water occurring or recurring in said river beginning at the point where the Southern Pacific Railway crosses said river* in Section 13, Township 3 South, Range 4 East of Gila and Salt River Base and Meridian *or between said point and a point one hundred feet above where the Salt River empties into the Gila River,* at the diversion points of said reservation as now or hereafter located, as of the following dates of priority:

| For 954 | acres | of | said | lands | January 1st, 1873. |
|---|---|---|---|---|---|
| " 587 | " | " | " | " | " , 1876. |
| " 660 | " | " | " | " | " , 1877. |
| " 139 | " | " | " | " | " , 1900. |
| " 58.5 | " | " | " | " | " , 1903. |

It is further provided that water rights with the priorities fixed as aforesaid are for the irrigation of said Gila Crossing Indian lands, but *subject at all times, to all rights on said Gila River above said point hereinabove described,* and provided also that said rights are subject to the right of the San Carlos project, to divert and use return flows, or water otherwise occurring in the river above said point and the right of said project to pump and otherwise interfere with and control the return flow from the lands of said project.

(Emphasis added.) The argument that the lands at Gila Crossing have rights that are senior to the rights of parties upstream of the Crossing lands lacks merit. First, Article VI(6) provides the right to divert only from the "water occurring or recurring" in the Gila in the area of the Crossing. No other diversion rights are specified in this manner. Second, the article expressly renders the diversion right "subject at all times" to the rights of other irrigators upstream. Finally, the priority rights set forth in the tabulation in Article VI(6) do not appear in the Priority Schedule of Article V, where

---

31. The Court notes that the Matlock proposal, which recommends a seepage deduction of about 0.3% is inadequately documented. *See* W. Gerald Matlock, Gordon R. Dutt, and Jack L. Stroehlein, *Supplemental Information: Salinity and Water Management in the Safford and Duncan–Virden Valleys, Arizona* 2–4 (October 25, 1994). This estimate of seepage is so radically different from any other proposed by the parties or their experts that the Court is unable, given the lack of supporting analysis, to give it serious consideration. In particular, the Court is unpersuaded that the Matlock proposal gives adequate consideration to the effect of phreatophytes in the reservoir basin.

every other priority call on the river is listed. The plain language of Articles V and VI(6) does not yield the interpretation suggested by GRIC. The Court concludes that Article VI(6) does not provide the Gila Crossing lands with priority calls that may be asserted against decreed irrigators upstream of the Gila Crossing lands.

### B. Clerical Error Related to Gila Crossing Lands

GRIC argues that Article VI(6) contains a clerical error related to the lands at Gila Crossing. That Article VI(6) contains at least one error is obvious from its face: the sum of the acreage listed with the priority dates, 2398.5 acres, does not correspond with the sum total of acres specified in the first clause of the section, 2992.5 acres. As GRIC demonstrated at trial, Article VI(6) was intended to correspond to information set forth in certain hearings before the House Committee on Indian Affairs. *See* The Condition of Various Tribes of Indians: Report on the San Carlos Irrigation Project: Hearings before the Committee on Indian Affairs of the House of Representatives, 66th Cong., 1st Session 139–42 (1919).

It is clear from the Court's review of the record of the hearing that there are, in fact, two clerical errors in the Article. First, the 139 acres specified as having a priority date of 1900 should specify a priority date of 1886. *Id.* at 141. Second, the tabulation should provide for a further 594 acres with a priority date of 1900. *Id.* 141–42. The Court therefore orders that Article VI(6) of the Decree is and shall be considered amended to provide for a priority tabulation for the Gila Crossing lands as follows:

| For 954 | acres of said lands January 1st, 1873. |
| " 587 | "  "  "  "  ", 1876. |
| " 660 | "  "  "  "  ", 1877. |
| " 139 | "  "  "  "  ", 1886. |
| " 594 | "  "  "  "  ", 1900. |
| " 58.5 | "  "  "  "  ", 1903. |

### VIII. LANDS "THEN BEING IRRIGATED"

The Decree provides for diversions of the Gila River for lands "then being irrigated." Article V provides that an owner of decreed water rights set forth in the Priority Schedule

is entitled thereunder and as of the date of said priority to divert from the natural flow of the stream, at the point of diversion so designated and to carry and convey to, and apply to beneficial use upon, said lands for the irrigation thereof, during each irrigation season, a total amount of water not exceeding 6 acre feet per each acre of said lands, which said amount shall not be diverted from the stream at any time during said season at a greater rate than one-eightieth ($\frac{1}{80}$) of a cubic foot per second for each acre of said lands, except as hereinafter provided; that the right of direct diversion from the natural flow of the stream for each of said parties, therefore, may be readily calculated, for the area then being irrigated as follows:

No of acres times 6 = Total allowable diversion in acre-feet during each irrigation season;

No of acres time $\frac{1}{80}$ = Rate of diversion in cubic feet per second which shall not be exceeded in making said draft.

In 1992, the Court ordered the parties to devise an appropriate scheme for reporting lands "then being irrigated" for auditing to detect abuses, and for assessing penalties for violations. *Gila Valley Irrigation District,* 804 F.Supp. at 18. The parties take issue with various aspects of a proposed reporting scheme. UVDs further argue that the reporting requirements and other restrictions of the "then being irrigated" clause and the water duty limitations of Article V should apply equally to irrigators in the lower valleys.

### A. Reporting Scheme

Both UVDs and the Apache Tribe have submitted proposals for reporting lands "then being irrigated." The Apaches' proposal requires an irrigator to, among other things, (1) report lands then being irrigated to the nearest tenth of an acre, (2) submit a map and legal description for each parcel then being irrigated, and (3) report lands then being irrigated on a monthly basis. UVDs argue that these requirements are neither reasonable nor required by the Decree. The Court agrees.

First, the Court finds that reporting to the nearest tenth of an acre is not feasible for the affected farmers. Although certain fed-

eral set-aside programs require reporting to the nearest tenth-acre, the evidence at trial indicated that Department of Agriculture determines the set-aside area, not the farmer. The burden on farmers to ascertain their acreage to the nearest tenth-acre, at this time, outweighs the benefits to be obtained by such reporting. The Court therefore concludes that the reporting scheme need only require reporting to the nearest acre, unless more accurate information is readily available to the irrigator. For example, if an irrigator has information either from a government agency or from his or her own survey that permits reporting to the nearest quarter-acre or tenth-acre, that information shall be reported.

The Court also rejects the proposal that irrigators be required to file maps and legal descriptions, unless such documentation is already available to them. It is sufficient that an irrigator report the location of the acreage "then being irrigated" in sufficient detail that it may be verified in accord with an auditing procedure. The aim here is that the Water Commissioner be able to audit the irrigator and determine whether abuses or violations are occurring, using the reporting form and such other information as is readily available from, for example, the canal companies or irrigation districts. The reporting requirements must do this much, but need not do more.

Finally, the Court agrees with UVDs that irrigators need only report lands "then being irrigated" during the "irrigation season," defined in Article V as a year. The chief difficulty with limiting diversions on a monthly basis according to the acreage being irrigated in a given month is that it deprives farmers of the ability to grow seasonal crops other than those selected by other farmers. As UVDs note, if only one farmer on a canal grows a winter crop, he or she may not be able to generate adequate head to transport the water through the canal and onto the field. If, however, the canal company's maximum rate of diversion is calculated on the basis of acreage being irrigated over the course of the entire irrigation season, then each grower will have adequate head. The Court notes, however, that although lands "then being irrigated" may be reported on an annual basis for purposes of calculating diversion rates, this conclusion is not a departure from the Court's prior determination that land not "then being irrigated" may not receive decree water. *Gila Valley Irrigation Dist.*, 804 F.Supp. at 16.

The Court considers it unnecessary to order the Water Commissioner to adopt one of the two proposed reporting schemes. The Commissioner is, however, directed to adopt a reporting scheme that will allow his office to comply with this Court's (and the appeals court's) present and prior rulings regarding the necessity of detecting, preventing, and penalizing violations of the Decree. A reporting form is required for this purpose primarily to ensure that the Water Commissioner is able to carry out the duties assigned to the office and that the enforcement of the Decree is accomplished with an appropriate measure of documentation and accountability. Provisions for seeking an Order to Show Cause and for assessing fixed penalties are required to preserve the due process rights of irrigators. The Court therefore directs the Water Commissioner to adopt a scheme for reporting and auditing lands "then being irrigated," and for correcting and penalizing violations. This scheme, which may or may not draw upon the proposals of the UVDs and the Apache Tribe, shall be presented to the Court for final approval as soon as practicable.

**B. Lands "Then Being Irrigated" in the Lower Valleys**

██ The parties also disagree on the application of the ⅛₀th cfs and the 6 AFA water duties and the "then being irrigated" clause as applied to the San Carlos Project lands. Specifically, UVDs argue that the lower valleys irrigators should be required, as UVDs will be, to report acreage "then being irrigated." UVDs also argue that the ⅛₀th cfs water duty applies equally in the lower valleys. Also, the Water Commissioner seeks clarification of whether irrigators in the lower valleys may divert in excess of 6 acre feet per acre then being irrigated in a year.

### 1. Water Duties in the Lower Valleys

The issue of applicable water duties in the lower valleys has a complicated history. In 1992, this Court held that the ⅙₀th cfs water duty did not apply to the use of stored water in the lower valleys. Specifically, the Court stated:

[T]o the extent that SCIIP's diversions in excess of the ⅙₀th cfs limitation are the result of stacking based on the number of decreed acres in the project area, these diversions do not violate the Decree. SCI-IP, like any other party to the Decree is limited by the 6 acre-feet total allowable diversion provided in the Decree, but its diversions of stored water shall not be deemed limited by the number of acres then being irrigated.

*Gila Valley Irrigation Dist.*, 804 F.Supp. at 19. The court of appeals affirmed, stating that the "diversion rate of ⅙₀th cfs per acre being irrigated is applicable to all parties to the Decree, not just to the UVDs (with the exception of water released after storage in the San Carlos Reservoir)." *Gila Valley Irrigation Dist.*, 31 F.3d at 1440. The court of appeals also noted that this Court's holding that the ⅙₀th cfs "limitation did not apply to the diversion of water stored in the Reservoir, then released" had not been appealed. *Id.* at 1431 n. 4.

The parties now seek clarification and new rulings on the issue of how the water duties apply in the lower valleys. The Water Commissioner requests clarification on the question of whether the 6 acre feet per acre then being irrigated limitation applies to San Carlos Project lands. His calculations show, he argues, that total diversions of stored and natural flow waters have exceeded 6 AF per acre then being irrigated in some years.

It is important to dispose of a procedural issue raised by the UVDs and the San Carlos Apache Tribe. As UVDs and the Apaches argue, this Court's analysis of the ⅙₀th cfs issues was premised, in part, on the oral argument prior to the 1992 decision. At that hearing, counsel for SCIDD raised the issue of whether lower valley irrigators were limited to ⅙₀th cfs per acre then being irrigated, and argued that such a diversion limitation would eradicate farming in the area. There was no objection to the argument that the diversion rate of ⅙₀th cfs per acre then being irrigated did not apply in the lower valleys. The Court clarified that SCIDD was not suggesting that it was entitled to more than 6 acre feet per acre then being irrigated.

UVDs have suggested that this exchange between counsel and the Court may constitute concession that the lower valley irrigators are subject to a total water duty of 6 acre feet per acre then being irrigated, regardless of whether the water diverted is natural flow or stored water. More importantly, UVDs argue that, if the lower valley irrigators had argued in 1992 that they were not bound by the 6 AFA limitation, UVDs would strenuously have objected. The Court concludes that neither UVDs nor the lower valley parties are bound by counsel's representations at oral argument. The Court's question at that argument merely clarified the issue that had been raised, which related to the ⅙₀th cfs limitation. The exchange does not foreclose analysis of the question of whether irrigators in the lower valleys are limited to a total of 6 AF per acre then being irrigated, including both natural flow and stored water.

The Court further concludes that diversions of stored water are not subject to either the ⅙₀th cfs or the 6 AFA water duty. This conclusion follows directly from the language of the Decree. First, Article V, which sets forth the ⅙₀th cfs and 6 AFA water duties is replete with references to "natural flow." The first paragraph of the Article provides that the parties named in the Schedule of Rights and Priorities own rights of "direct diversion from the natural flow of the stream" at the specified rate and limit. The same paragraph further provides for

the right of the United States, as of the year 1924, to store the waters of the Gila River in the San Carlos Reservoir, which is specifically defined in Article VI and is of different character than the rights directly to divert from the natural flow of the stream, with which this Article of the Decree and the Priority Schedule made part hereof primarily has to do . . . .

This clause distinguishes the scheduled Article V rights to divert from the natural flow from the storage right, which is described in Article VI. That this right is of a different character is further emphasized in the Schedule of Rights and Priorities. For natural flow rights, the schedule specifically expresses diversion rights both in terms of the total number of acre-feet and in terms of a maximum diversion rate in cubic feet per second. For example, for a 4 acre parcel, the schedule lists a diversion right of 24 AF at a maximum rate of 0.05 cfs. In contrast, the storage right is not tied to a diversion rate or a maximum number of acre-feet. Rather, the entry in the schedule relating to the storage right simply lists the 1,285,000 AF capacity of the San Carlos Reservoir.

Second, the language of Article VI(4) and (5) compels the same analysis. Article VI(4) provides for the right to divert 603,276 AF "from the natural flow" of the Gila River for the irrigation and reclamation of 100,546 acres. Article VI(5), however, provides for

[t]he right, as of the date of priority of not later than June 7, 1924,—and for the purposes of this decree and for them only as of said date—to store the waters of the Gila River in the San Carlos Reservoir of the aforesaid San Carlos Project by means of the Coolidge Dam ... to the extent of the full 1,285,000 acre-feet capacity of said Reservoir at all times when said waters are available above said dam for such storage under the aforesaid priority; and the right in that relation to accomplish and control the release from said reservoir of the waters so stored and thus reduced to ownership, and to conduct the same down the channel of the Gila River to the Ashurst–Hayden and Sacaton diversion dams of the San Carlos Project and there to recapture and divert, and control the diversion of, the same by means of said dams for the conveyance in the canals leading therefrom to the above described 100,546 acres of the lands of said Project for the reclamation and irrigation thereof, and for the supplementation of amounts available therefor at said dams from the natural stream flow under plaintiff's rights as same are decreed herein, and for State and

Federal purposes under act of March 7, 1928, as hereinbefore described.

The language of this provision is plain: waters stored behind the dam are "reduced to ownership." This language, which does not appear in the context of the schedule of rights and priorities in Article V, further differentiates the stored water right from that of the natural flow rights. The Water Commissioner argues that the reference in the clause to "supplementation" means that Article VI(5) provides only a right to supplement the natural flow up to the 6 AFA water duty. The Court disagrees. The concept of supplementation is nowhere so defined in the Decree; in fact the term is equally susceptible to the interpretation that Article VI(5) provides a right to supplement natural flow water with stored water up to any amount.

Third, the distinction between natural flow waters and stored waters is echoed in Article XI, which provides that

no diversion of water from the *natural flow* of the stream into any ditch or canal for direct conveyance to the lands shall be permitted as against any of the parties herein except in such amount as shall be actually and reasonably necessary for the beneficial use for which the right of diversion is determined and established by this Decree, to wit: shall be made only at such times as the water is needed upon their lands and only in such amounts as may be required under the provisions hereof for the number of acres *then being irrigated.*

The omission of a reference to stored waters here supports the conclusion that the drafters intended to treat stored waters differently.

Finally, the Court notes that this interpretation is completely in accord with the prior decisions of this Court and the Ninth Circuit Court of Appeals. As noted above, this Court previously held that SCIIP's diversions of stored water "shall not be deemed limited by the number of acres then being irrigated." *Gila Valley Irrigation Dist.,* 804 F.Supp. at 19, and the Ninth Circuit affirmed. *Gila Valley Irrigation Dist.,* 31 F.3d at 1440 (noting that the water duties apply to all parties, "with the exception of water released after storage in the San Carlos Reser-

voir". *Gila Valley Irrigation Dist.,* 31 F.3d at 1440.

The Court must reject the assertions of UVDs and the San Carlos Apaches that this conclusion is either unfair or a special exception to the water duties listed in Article V. As counsel for GRIC noted at the oral hearing on the motion to clarify this issue, "it doesn't matter what I think, it matters what the 1935 Decree says." Tr. at 24 (Dec. 1, 1995). The Court is not here to reexamine issues of fairness in the Decree. Nor does the Court create a special exception when it concludes that the drafters included language that treats natural flow waters differently from stored waters. The Court is further unconvinced that this conclusion is unfair to the UVDs. UVDs argue that they receive their principal apportionment based on water stored as of January 1 of each year, and that diversions of stored water contributing to the application of amounts greater than 6 AF per acre then being irrigated tend to decrease this apportionment. However, UVDs obtain supplemental apportionments throughout the year, based on accessions to the reservoir. The Court sees no particular injustice in the loss of the asserted "right" to count the water a second time. In addition, because the priority date for the storage right is so late, UVDs are able to divert on priority in advance of SCIIP's ability to store water.

There are additional protections in the Decree and in western water law generally to protect the interests of all parties. All parties to the Decree are constrained by the beneficial use doctrine. To say that diversions of stored water are not limited to the 6 AFA and ⅙₀th cfs water duties is not to say that irrigators in the lower valleys are not equally obliged to ensure that diversions are for the purposes set forth in the Decree and are not wasteful.

Accordingly, the Court concludes that there is no violation of the Decree if diversions by SCIIP exceed the ⅙₀th cfs water duty or exceed 6 AF per acre then being irrigated, to the extent that the excess is attributable to the release and diversion of stored water.

## 2. Applicability of the Reporting Scheme in the Lower Valleys

The Court agrees with UVDs that the reporting requirement applies to all irrigators using natural flow water, including the users in the lower valleys. The Court is unable to conclude that the Commissioner can successfully implement the call system and manage the river without information on the acreage being irrigated by all parties receiving natural flow water.

## IX. CROPS OF VALUE

The government and the Apache Tribe argue that Article XI of the Decree limits the use of the Gila River water to irrigating "crops of value." Other parties to the Decree, including UVDs, ASARCO (as successor-in-interest to Kennecott Copper Corporation), and SCIDD, argue that the relevant language of Article XI, taken in context with the remainder of the Decree, does not operate to limit the beneficial uses to which decreed water may be devoted.

Article XI of the Decree provides

That *the lands within the Gila River watershed for the irrigation of which rights are decreed herein are arid or semi-arid in character and require irrigation in order that crops of value may be produced thereon;* that except as herein specifically provided no diversion of water from the natural flow of the stream into any ditch or canal for direct conveyance to the lands shall be permitted as against any of the parties herein except in such amount as shall be actually and reasonably necessary for the beneficial use for which the right of diversion is determined and established by this Decree, to wit: shall be made only at such times as the water is needed upon their lands and only in such amounts as may be required under the provisions hereof for the number of acres then being irrigated; ... *that any of the parties to whom rights to water have been decreed herein shall be entitled, in accord with applicable laws and legal principles, to change the point of diversion and the places, means, manner or purpose of the use of the waters to which they are so entitled* or of any part thereof, so far as

they may do so without injury to the rights of other parties as the same are defined herein.

(Emphasis added.)

Plaintiffs argue that the phrase "in order that crops of value may be produced thereon" plainly indicates that the Decree drafters intended that Gila River water be used solely for agricultural purposes, specifically the irrigation of crops of commercial value. They argue, therefore, that the Court should adopt an appropriate regulation, such as one used by the Bureau of Reclamation, for determining what constitutes a crop of value.

In addition to the plain language of Article XI, plaintiffs rely on two other aspects of the Decree in support of their argument. First, Article IX, unlike any other article of the Decree, provides that the Kennecott Copper Corporation is entitled to divert underground water "for industrial, municipal, domestic and related beneficial purposes." The express provision for these uses in Article IX supports their interpretation that such uses are, by implication, unauthorized for lands described elsewhere in the Decree. Second, the Decree is replete with references to irrigation. The water duty limitations of 1/80th cfs and 6 AFA are the sort of limitations associated with agriculture, as opposed to municipal or domestic uses. Indeed, it is difficult, reading the Decree, to imagine that the drafters had other uses in mind for the waters of the Gila River.

Plaintiffs also find support in the prior rulings of this Court and the court of appeals to the effect that the "then being irrigated" language of Article V refers to the irrigation of crops. For example, the court of appeals stated that "[t]he language clearly includes only those lands which are then being irrigated, that is those lands upon which water is

being placed in order to grow crops." *Gila Valley Irrigation Dist.*, 31 F.3d at 1439.[32]

UVDs on the other hand, argue that the Decree represents no departure whatsoever from the beneficial use doctrine and that users are free to change the purposes to which they put their water, provided the use may be described as "beneficial." UVDs note, for example, that certain priorities listed in the Decree are inconsistent with commercial agricultural production. Article V sets out priorities for parcels as small as one tenth of an acre, and many priorities for plots of a few acres or less. Further, there are priority rights assigned to parcels belonging to towns, churches, and school districts. *See* Article V, at 73–85.

Although the Court agrees with UVDs that the Decree assigns priority rights to parcels that presumably could not sustain commercially viable agriculture, the Court finds that UVDs have not overcome the greater weight of the indications that the drafters intended that the Gila River would be dedicated to *agriculture,* as opposed to municipal, domestic, and industrial purposes. In fact, the testimony at trial revealed not that UVDs were using the Gila River for municipal and industrial purposes when their rights accrued and when the Decree was adopted, but rather that many people in the upper valleys had vegetable gardens.

The Court concludes, therefore, that the Decree was intended to establish an order of priorities for water that would be devoted primarily to agriculture. The Court rejects plaintiffs' argument that such agriculture must be commercial in nature. There is no evidence that all of the agriculture on the river at the time the Decree was entered was commercial in nature. Moreover, such a constrained reading of "crops of value" is unnecessarily restrictive, not only as to the UVDs,

**32.** The Apache Tribe further argues that it follows from this Court's 1992 decision that Gila River water may not be used for purposes other than growing crops. In *Gila Valley Irrigation District,* this Court held that the Tribe could not lay claim to a live stream condition, not expressly provided for in the Decree, in order to have sufficient water on the San Carlos Reservation year-round for economic, recreational, medical, and religious purposes. 804 F.Supp. at 10. The Tribe's argument that the Court implicitly held

that decree water may be used only for crops of value arises from a misinterpretation of the decision. The Court did not, in that order, address the beneficial use doctrine. Nor did the Court hold that the purposes for which the Tribe sought a live stream were not beneficial. The Court merely held that the Tribe could not obtain a live stream condition other than by establishing the entitlement to such condition under the terms of the Decree.

but as to the tribes. A crop grown for personal consumption or subsistence is clearly a "crop of value." The Court agrees, however, that the Decree does not contemplate uses that are primarily municipal (such as watering golf courses, parks, playing fields and the like, and processing sewage or other waste), domestic (such as watering lawns or flowers, or for pets), or industrial.

The Court considers it unnecessary, at this time, to adopt a formal regulation regarding the alleged municipal, domestic, and industrial uses of decree water in the upper valleys. Not all such uses would necessarily violate the Decree. Further, Article XI expressly provides that parties may change the purpose of the use of decree waters, "so far as they may do so without injury to the rights of other parties." The Court agrees with the government, however, that an irrigator is not free to change the use of decree water without, at a minimum, declaring the change of use by formally notifying the Water Commissioner. Any such declaration of a change in use is subject to challenge by other parties who might be injured. The Court further agrees with the government that a user is entitled to no more water than is necessary for the beneficial purpose intended by the user. To the extent that a change in use reduces a user's water requirement, the Commissioner must ensure that the diversion is appropriately limited.

The Court declines, at this time, to order the Commissioner to adopt formal procedures for handling proposed changes in use of decree water, or for determining the scope of changes that have already been made. The Commissioner is directed to exercise his discretion in determining the extent to which UVDs are using decree water for non-agricultural purposes and considering approaches to rectify the situation.

## X. CALL SYSTEM

In 1992, this Court directed the development and implementation of a call system to be administered by the Water Commissioner. *Gila Valley Irrigation Dist.,* 804 F.Supp. at 15. It is apparent that the parties, with the particularly valuable assistance of Gookin Engineers, have diligently worked to develop a workable computer-assisted call system. Although certain legal assumptions embodied in the Gookin Call System are challenged and addressed in this Order, the Court wishes to express its appreciation for the efforts expended thus far to create a reliable system for administering calls on the Gila River.

As the Court understands the situation currently, the Water Commissioner is implementing, or is prepared to implement, the Gookin Call System. To the extent that the Commissioner requires direction from the Court on this matter, the Court directs him to implement the Gookin Call System, subject to the conclusions expressed in this Order and in prior and future orders and rulings from this Court. The Court assumes that the call system will require modification based on this Order. The Court further assumes that time and use will reveal flaws, errors, or imperfections in the Gookin Call System that will require further modifications and adjustments. Because the successful implementation of the call system will be an on-going process, the Court directs the Water Commissioner and, to the extent necessary, the parties, to periodically advise the Court of the status of the implementation process.

The parties have submitted several objections to the legal assumptions embodied in the call system. Several of these objections are addressed in previous sections of this order. To summarize:

(1) The Apache Tribe's 1846 priority right to divert up to 12.5 cfs is not subject to UVDs' apportionments. However, the immemorial right to 437.5 cfs for the Gila River Indian Reservation is forfeited as to apportioned water. Therefore, if UVDs issue an apportionment call, they must allow sufficient flow to pass to satisfy an 1846 priority call by the Apache Tribe. The Apache Tribe need not let this flow pass to satisfy an immemorial call by GRIC.

(2) UVDs are not required to exhaust their apportionments before making a call for priority water.

(3) UVDs in the Duncan–Virden Valley may, in accord with the Cosper's

Crossing agreement, divert apportioned water in disregard of the prior rights to apportionments of UVDs in the Safford Valley. UVDs may not, under the Cosper's Crossing agreement, divert apportioned water in disregard of the rights of the Apache Tribe.

(4) UVDs may divert on apportionment when they have an unused apportionment available to them, regardless of whether water is stored and presently available for release downstream from the Coolidge Dam.

(5) The priorities for the lands in the Gila Crossing District extend only to the waters occurring or recurring in the river at the district as described in Article VI(6), and therefore, the diverters in the Gila Crossing District are not entitled to a call on the river as against the diverters upstream.

## XI. ADWR URBANIZED STUDY

█ In October of 1992, the Arizona Department of Water Resources offered to conduct a study for the Rules Committee and the Court. The purpose of the study was to identify lands that have been permanently removed from agricultural use, so that diversions for lands not "then being irrigated" may be prevented. *See Gila Valley Irrigation Dist.*, 804 F.Supp. at 16–18. The ADWR completed the draft study in April 1994. Pursuant to an Order of this Court, interested parties were allowed to file formal objections with the Water Commissioner for further consideration by ADWR. *Gila Valley Irrigation District*, Memorandum and Order at 5 (September 23, 1993). A total of 232 objections were determined by the Commissioner to have merit and were referred to ADWR. ADWR released its final report in September, after considering the objections.[33] The Court greatly appreciates the efforts expended by the ADWR for this comprehensive document.

The Apache Tribe argues that all of the lands identified by the ADWR as urbanized should be permanently deleted from the Decree. The Court rejects this proposition. The Decree will not be rewritten to reflect changes in land use. As this Court previously determined, the purpose of locating and identifying urbanized areas is to remove them "from the total decreed acreage which serves as the basis for priority and apportionment determinations." *Gila Valley Irrigation Dist.*, 804 F.Supp. at 18. The Commissioner is empowered, and directed, to cease diversions for urbanized land by reducing the diversions to the canals serving these lands. It is unnecessary to delete these lands from the Decree. The Court further agrees with UVDs that it is unwise to delete urbanized lands from the Decree because such lands might be returned to agricultural production in the future.[34]

UVDs and the Tribe also disagree as to the method the Court should adopt for final review of objections to the ADWR Final Report. The Court's Order of September 23, 1993 states:

> Provided that a timely objection to the initial draft of the Report was filed with the Water Commissioner, a party dissatisfied with ADWR's final report on an issue contained in its written objection to the Water Commissioner may file a complaint with the United States District Court for the District of Arizona. The proceedings in the U.S. District Court will be governed by the summary review procedures discussed in Section VI below.

*Id.* at 6. The Court agrees with the Apache Tribe that persons who did not file a timely objection to the draft report may not object now. However, a person who did not object to the draft report may object to the final

---

**33.** The draft reported concluded that a total of 1,676 acres of decreed land in the upper valleys were urbanized. Based on further scrutiny, objections, and reanalysis of townsites, ADWR reduced the number of urbanized acres to 1,314. *See generally* ADWR, *In re The General Adjudication of the Gila River System And Source: Urbanized and Permanently Retired Globe Equity No. 59 Agricultural Lands in the Upper Gila River Valleys*

(September 1994) (hereafter "ADWR Final Report").

**34.** The Court expresses no opinion on whether decree lands might lose their priority rights through the operation of law after extended periods of non-agricultural use.

report if the final report newly identifies as urbanized a parcel which was not so identified in the draft report. This exception is necessary to protect the owners of decreed acreage who did not object to the draft report because their lands were not identified as urbanized in that report. The final report indicates, for example, that ADWR, based on its own review of the draft report and certain maps, determined that 348 acres of lands not identified as urbanized in the draft report should be classified as urbanized. ADWR Final Report at 26–27, Appendix D.

The Court will, by separate order to be provided to all interested parties, specify the procedure by which parties may file objections to the Final Report.

SO ORDERED AND AMENDED.